# In the United States Court of Federal Claims

### FOR PUBLICATION

Nos. 15-1252 & 15-1268L
(Filed: October 24, 2022)

|  |  |  |
|---|---|---|
| **JOHN ARNOLD, *et al.*,** | ) | |
| *Plaintiffs,* | ) | |
| *and* | ) | |
| **JOE L. DAWSON, *et al.*,** | ) | Rails-to-Trails Temporary Taking: Attorney's Fees and Expenses under 42 U.S.C. § 4654(c) |
| *Consolidated Plaintiffs,* | ) | |
| v. | ) | |
| **UNITED STATES,** | ) | |
| *Defendant.* | ) | |

*Meghan S. Largent*, Lewis Rice, LLC, St. Louis, MO, for plaintiffs Conrad C. Cox and Mary R. Cox as Trustees of the Conrad C. Cox Trust No. 1 and the Mary R. Cox Trust No. 1; Joe L. Dawson; Lloyd E. Edgett; G&M Properties, LP; Shawn Guinn; John W. Mathes, Jr. as Executor of the Estate of Rosemary L. Mathes, and Duane R. McEwen and Darlene McEwen; Duane R. McEwen and Darlene McEwen; Carol K. Ross and Kay L. Lee as Trustees of the Carol K. Ross Trust No. 1; Iris L. Smith and Carol Campbell as Trustees of the Larry L. Smith and Iris L. Smith Revocable Living Trust Dated 7/17/07; Lisa J. Sonsthagen as Executor of the Estate of Linda J. Tomasch, and John E. Bremer and David G. Bremer; and Alan Woodside and Sherry Woodside as Trustees of the Shirley Kats Revocable Trust, and Derek Kats as Trustee of the Derek Kats Revocable Trust.

*James H. Hulme*, ArentFox Schiff LLP, Washington, DC, for plaintiffs Jason Dial and Travis Dial; and M. Lee Juenemann and Angela Juenemann as Trustees of the M. Lee Juenemann Living Trust and Angela Juenemann Living Trust.

*Davené D. Walker*, Senior Attorney, Natural Resources Section, Environment and Natural Resources Division, U.S. Department of Justice, Washington, DC, for defendant.  With her on the briefs were *Todd Kim*, Assistant Attorney General, Environment and Natural Resources Division, and *David A. Harrington*, Assistant Chief, and *Hannah O'Keefe*, Trial Attorney, Natural Resources Section, Environment and Natural Resources Division, U.S. Department of Justice, Washington, DC.

## OPINION AND ORDER[1]

***BONILLA, Judge***.

This rails-to-trails temporary takings case involves fractions of properties abutting a now-abandoned interstate railroad extending through parts of Nebraska and Kansas.  The compensable Fifth Amendment taking began on October 22, 2015, when the United States Surface Transportation Board (STB) issued a Notice of Interim Trail Use (NITU) under Section 1247(d) of the National Trails System Act, 16 U.S.C. §§ 1241–51, and presumably ended on October 16, 2016, with the NITU's expiration.[2]  In accordance with Rule 54(b) of the Rules of the United States Court of Federal Claims (RCFC), the parties stipulated to the entry of partial final judgment in favor of 13 owners of 17 parcels of land totaling 51.09 acres in the aggregate amount of $7,595.17 in just compensation, with each plaintiff recovering between $11.54 and $2,109.45, plus interest.

Pending before the Court is plaintiffs' application for $794,577.50 in attorney's fees and $74,007.37 in litigation expenses under the Uniform Relocation Assistance and Real Property Acquisition Policies Act (URA), 42 U.S.C. § 4654(c).  The claimed attorney's fees and expenses exceed the bounds of any objective measure of reasonableness.  For the reasons detailed herein, plaintiffs are awarded $100,282.47 in attorney's fees and $27,424.06 in litigation expenses.  Accordingly, Plaintiffs' motion is GRANTED–IN–PART and DENIED–IN–PART.

---

[1] This decision is limited to the case filed as *Dawson v. United States*, No. 15-1268 (Fed. Cl.).  The consolidated matter captioned *Arnold v. United States*, No. 15-1252 (Fed. Cl.), remains pending.

[2] As discussed *infra*, throughout this litigation, plaintiffs maintained that the taking continued until the railway company consummated the abandonment (i.e., September 3, 2019).  Because the parties resolved this issue in stipulating the just compensation due plaintiffs before the United States Court of Appeals for the Federal Circuit issued its decision in *Memmer v. United States*, 50 F.4th 136 (Fed. Cir. 2022), this Court did not address the disputed three-year gap.  *See id.* at 146 ("We agree with the government that the taking ended upon expiration of the NITU . . . . This is so because it was on that date that the United States was no longer responsible for mandating the continuation of the easement because, from that point forward, the decision rested solely in the hands of [the railroad company].").

## BACKGROUND[3]

The Nebraska, Kansas & Colorado Railway, LLC (NKCR) previously operated an interstate railroad line that ran through, relevant here, Harlan County, Nebraska, and three counties in Kansas (i.e., Norton, Decatur, and Phillips).  This litigation involved 19 landowners in the identified Nebraska and Kansas counties claiming an interest in 25 properties adjacent to or near the now-abandoned NKCR railroad tracks.  Ultimately, as detailed below, the prevailing plaintiffs consisted of 13 owners of 17 tracts of land located in Kansas.

On June 12, 2015, NKCR filed a verified notice of exemption with STB, formally announcing its proposed abandonment of the railroad segment relevant here.  STB issued an abandonment exemption and allowed NKCR until August 7, 2016, to consummate abandonment.  In September 2015, Sunflower Rails-to-Trails Conservancy, Inc. (Sunflower) formally noticed its interest in converting the NKCR railroad segment to recreational trails.  On October 22, 2015, STB issued a NITU authorizing NKCR and Sunflower to negotiate a trail-use agreement within 180 days.  At Sunflower's request, STB extended the negotiation period by an additional six months.  NKCR and Sunflower did not reach an agreement, and the NITU expired on October 16, 2016.[4]

On November 17, 2016, STB directed NKCR to file a notice of consummation by December 15, 2016, if the railway company elected to abandon the rail line.  In response to a series of requests for additional time submitted by NKCR, the consummation deadline was extended through March 1, 2020.  NKCR consummated the abandonment on September 3, 2019.

## SUMMARY OF PROCEEDINGS

## I.   Complaints Filed and Retainer Agreements Executed

On October 27, 2015, five days after STB issued the NITU, plaintiff Joe L. Dawson filed this action as the sole plaintiff.  Thereafter, between May 6 and October 26, 2016, three amended complaints were filed adding 18 plaintiffs, including additional individual landowners as well as singular and joint trusts and families.  Plaintiffs' fourth and fifth amended complaints, filed on February 1 and July 20, 2017, respectively, did not add plaintiffs, parcels of land, or counts.

---

[3] In *Arnold v. United States*, 137 Fed. Cl. 524 (2018), the Court recounted the facts and procedural history of these consolidated cases in detail.  To provide context for the analysis herein, a brief recapitulation of the background and a more comprehensive summary of proceedings–particularly those post-dating the April 10, 2018 opinion–are included.

[4] Sunflower's request for an additional extension of the NITU negotiation period was denied after NKCR noticed its objection.

Instead, the last two amended complaints reordered the plaintiffs and reorganized the documentation related to the disputed land (e.g., deeds, tax records) as well as the subject rails-to-trails conversion.  In the interim, on February 14, 2017–two weeks after filing the fourth amended complaint–the parties stipulated to the voluntary dismissal of plaintiffs Donald G. Edgerton and Lisa A. Edgerton (originally added in the May 6, 2016 first amended complaint).  At the outset of this litigation, the initial plaintiff estimated damages at $1 million.

From the commencement of this action through January 2019, Mark F. Hearne, II, and then Meghan S. Largent of the law firm Arent Fox LLP (now ArentFox Schiff) [hereinafter "ArentFox"] served as counsel of record for all (eventually 19) plaintiffs.[5]  In early 2019, Ms. Largent moved her practice to the law firm of Lewis Rice LLC [hereinafter "Lewis Rice"] and continued representing 11 of the 13 plaintiffs ultimately awarded just compensation.  The other two prevailing plaintiffs remained with ArentFox and, as of August 12, 2019, James H. Hulme began serving as their counsel of record.  Throughout the pendency of this case, in addition to counsel of record, the law firms heavily staffed this matter, including roughly three dozen timekeepers comprised of attorneys at all levels (i.e., Partners, Members, Of Counsel, Associates) and various supporting legal professionals (i.e., Specialist, Paralegals, Project Assistants).

In connection with their initial representation by ArentFox, each plaintiff agreed to a contingent-fee arrangement, whereunder the law firm agreed to incur and advance all expenses and the plaintiffs bore no costs unless and until counsel secured a successful judgment or award.  In the retention letter, more specifically, counsel represented:

> The Firm has agreed to represent you, and the other property owners that join this action, on a contingency fee basis.  This means that if we are not successful in obtaining a judgment or award from the government there will be no cost to you for the Firm's professional services.  If we are successful, we will receive a fee that is the greater of either:
>
> (a) one-third of the "Total Award" received by all property owners (or forty-percent in the case of an appeal); or
>
> (b) the statutory attorney fee determined by the Court.

---

[5] Mr. Hearne served as counsel of record until March 22, 2017, when the Court granted Ms. Largent's motion for substitution of counsel pursuant to RCFC 83.1(c)(4)(A)(i)(I).

The "Total Award" includes the damage award for the value of the property taken, all interest awarded upon this amount, and the award of a statutory attorney fee (less any unreimbursed expenses).

*See, e.g.*, ECF 188-1[6] at 3 (emphasis in original).[7]

## II.   Resolution of Title Issues

During a November 22, 2016 status conference, the Court directed plaintiffs to file a "partial motion[] for summary judgment regarding title issues, including fee or easement, intervening roads, and adjacency." ECF 29. By February 14, 2017, after seeking additional time to comply with the Court's November 22, 2016 order, the parties stipulated to plaintiffs' land ownership with regard to all but one parcel as well as the railroad adjacency of all but another parcel; nonetheless, the parties disputed the nature of the railroad's ownership interest with regard to the entirety of the land at issue. *See* ECF 35 & 35-1. On March 12, 2017, plaintiffs moved for partial summary judgment on the more global issue of liability. ECF 37 & 41. After the government filed a cross-motion, the Court denied plaintiffs' motion as premature and directed plaintiffs to file a revised motion addressing solely the title issues consistent with the Court's November 22, 2016 order. *See* ECF 54 & 55.

On July 21, 2017, in accordance with the Court's July 7, 2017 order, plaintiffs filed their revised motion for partial summary judgment addressing title issues, albeit limited to a subset of plaintiffs (i.e., 13 Kansas property owners). *See* ECF 65. When pressed to comply with the Court's order to move on behalf of *all* plaintiffs, the five Nebraska plaintiffs voluntarily dismissed their six takings claims eight days after filing their fifth (and final) amended complaint. *Compare* ECF 67 (motion for voluntary dismissal) *with* ECF 62 (fifth amended complaint). The government filed a renewed dispositive cross-motion on August 18, 2017. ECF 73. On November 17, 2017, the government partially withdrew its dispositive cross-motion and stipulated that NKCR possessed only an easement for all save one of the 18 then-remaining parcels in dispute.[8] *See* ECF 80 & 80-1. The government's concession was based on the then-recent (October 27, 2017) decision of the Supreme Court of Kansas in *Jenkins v. Chicago Pac. Corp.*, 306 Kan. 1305,

---

[6] Unless otherwise specified, the ECF numbers used herein refer to the docket entries in *Dawson*, No. 15-1268L.

[7] The Court was not provided copies of or otherwise briefed on the terms of any subsequent retention agreements signed by the plaintiffs who elected to continue with Ms. Largent's legal representation when she moved her practice to Lewis Rice.

[8] The disputed parcel is owned by Conrad C. Cox and Mary R. Cox as Trustees of the Conrad C. Cox Trust No. 1 and the Mary R. Cox Trust No. 1 [hereinafter "disputed Cox parcel"]. The Coxes own a second parcel that was included in the government's concession.

403 P.3d 1213 (2017), clarifying the governing state law regarding railroad easements.

In an Opinion and Order dated April 10, 2018, consistent with the parties' stipulations, this Court granted the remaining 13 plaintiffs' motion for summary judgment with regard to the title issues concerning 17 parcels, finding: plaintiffs owned the properties at the time of the NITU issuance, the land was adjacent to the railroad corridor, and NKCR possessed only an easement limited to railroad purposes. *See Arnold*, 137 Fed. Cl. at 582–84. The Court denied both parties' motions as to the disputed Cox parcel. *See id.* at 536 n.10, 560–61, 582. On June 25, 2018, the parties stipulated to the voluntary dismissal of the claim involving the disputed Cox parcel. *See* ECF 91.

In sum, by June 25, 2018, plaintiffs voluntarily dismissed or stipulated to the dismissal of 8 of 25 claims brought by or on behalf of 6 of 19 plaintiffs. Additionally, title issues regarding the land underlying the remaining 17 claims asserted by 13 plaintiffs were resolved largely through stipulation.

## III.   Determination of Liability

With the title issues settled, the focus shifted to the parties' fundamental disagreement regarding the liability analysis applicable where, as here, no trail-use agreement is reached before the NITU expires. As documented in a July 6, 2018 joint status report, plaintiffs argued that the issuance of the NITU gave rise to a *per se* taking; the government, in contrast, maintained that absent an executed trail-use agreement, the expired NITU was subject to the multi-factor temporary takings analysis under *Arkansas Game & Fish Comm'n v. United States*, 568 U.S. 23, 38–40 (2012). *See* ECF 93. The parties further disputed the need for and proper scope of discovery. *See* ECF 97, 99. The government alternatively proposed to stay proceedings pending rulings by the Federal Circuit in two cases addressing the disputed liability analysis.[9] *See, e.g.*, ECF 103 at 4. Plaintiffs opposed the stay and requested that the case proceed to a liability determination.

---

[9] *See Caquelin v. United States*, 697 F. App'x. 1016, 1019–20 (Fed. Cir. 2017) (*Caquelin I*) (remanding case for further consideration of proper takings framework applicable to cases where NITU expired without trail-use agreement), *on remand*, 140 Fed. Cl. 564 (2018), *aff'd*, 959 F.3d 1360 (Fed. Cir. 2020) (*Caquelin II*); *Memmer*, 50 F.4th at 136 (remanding case for recalculation of damages based upon conclusion that expiration of NITU without trail-use agreement served as takings end date).

In May 2019, plaintiffs sought third-party discovery from OmniTRAX Inc.[10] After the Court limited discovery to state law abandonment issues, plaintiffs withdrew the third-party subpoena. *See* ECF 108, 109, 112. Following the parties' stipulated removal of the railroad tracks and ties from the subject railroad segment, on July 2, 2019, plaintiffs proposed to file a motion for partial summary judgment addressing state law abandonment, noting the government's objection as to the necessity of the proposed briefing. ECF 112 at 1–2. Plaintiffs filed their opening brief on July 25, 2019. ECF 114, 119.[11] In sum, the parties disputed whether NKCR–which had not yet consummated its abandonment of the railroad under the federal regulatory process–effectively abandoned its easement under Kansas state law; and, if so, the import of actions by a private party (i.e., NKCR) to a takings claim filed against the federal government. *See* ECF 114, 122. On September 3, 2019, prior to plaintiffs' filing of their reply brief, NKCR consummated its abandonment. The parties then disputed whether the claimed Fifth Amendment taking ceased on October 16, 2016, when the NITU expired, or continued for an additional three years until NKCR consummated its abandonment on September 3, 2019.

Following the issuance of the Federal Circuit's May 29, 2020 decision in *Caquelin II*, the parties agreed to engage in settlement discussions and requested a stay of proceedings. *See* ECF 156. The Court ultimately dismissed plaintiffs' motion for partial summary judgment on the issue of liability as moot. ECF 202.

## IV.   Just Compensation Settlement

On December 17, 2020, the parties reported to the Court that they reached a tentative settlement on the just compensation due the remaining landowners but needed additional time to negotiate plaintiffs' claims for attorney's fees and expenses under 42 U.S.C. § 4654(c). After reaching an impasse in their efforts to settle plaintiffs' claims for attorney's fees and expenses, discussed *infra*, the parties stipulated to the entry of partial final judgment under RCFC 54(b) in favor of 13 plaintiffs; specifically, the owners of 17 parcels of land totaling 51.09 acres

---

[10] According to its motion to quash or modify the subpoena and for a protective order: "OmniTRAX, Inc. is a transportation management company that manages and provides corporate services to numerous shoreline railroads, including NKCR, and other transportation entities, pursuant to independent management arrangements with each transportation entity. OmniTRAX, Inc. has no ownership interest in any of the entities it manages." ECF 109 at 2 n.1.

[11] The motion was filed on behalf of all remaining plaintiffs by Ms. Largent who, by that point, had moved from ArentFox to Lewis Rice. *Compare* ECF 114 (motion for partial summary judgment filed on July 25, 2019) *with* ECF 105 (Largent notice of address change). On August 16, 2019, four days after Mr. Hulme (ArentFox) became counsel of record for 2 of the 13 remaining plaintiffs (i.e., Jason Dial and Travis Dial, M. Lee Juenemann and Angela Juenemann as Trustees of the M. Lee Juenemann Living Trust and Angela Juenemann Living Trust), the Dials and Juenemanns noticed their intent to join the pending motion. *See* ECF 115–16, 119.

would split the aggregate sum of $7,595.17 in just compensation, with claimants recovering between $11.54 and $2,109.45, plus a nominal amount of interest.[12] On May 25, 2022, the Court entered partial judgment consistent with the parties' settlement.[13]

## V.      Attorney's Fees and Expenses

On April 2, 2021, the parties reported to the Court that they reached a tentative comprehensive settlement, inclusive of attorney's fees and expenses.[14] ECF 167.  Four months later, on August 2, 2021, the government reported that the settlement was not approved by the authorized representative of the United States Attorney General.  *See* ECF 175.  Consequently, as noted above, on May 25, 2022, by stipulation, partial final judgment was entered for plaintiffs in an aggregate amount of $7,595.17 in just compensation, plus interest.

Pending before the Court is plaintiffs' request for a total of $794,577.50 in attorney's fees and $74,007.37 in litigation expenses.  According to plaintiffs' counsel's joint application, between October 2015 and January 2019 (i.e., when Ms. Largent moved from ArentFox to Lewis Rice), plaintiffs purportedly incurred $532,485 in attorney's fees and $73,710.51 in litigation expenses.  The two plaintiffs who continued to be represented by ArentFox (eventually by Mr. Hulme) thereafter purportedly incurred $93,431.50 in attorney's fees through April 2022.[15]  The eleven plaintiffs who elected to continue with Ms. Largent's legal representation following her move to Lewis Rice purportedly incurred $168,661 in attorney's fees and $296.86 in expenses between January 2019 and April 2022.

The government challenges the reasonableness of plaintiffs' request for attorney's fees and expenses on several grounds.  First, the government contends that the URA limits recovery to attorney's fees and expenses "actually incurred" by plaintiffs which, based on the initial ArentFox retainer agreement executed by the plaintiffs, is one-third of the $7,595.17, plus interest, in total damages awarded.  Alternatively, the government argues that plaintiffs' claimed hourly billing rates far exceed applicable local-market rates; and, further, that plaintiffs improperly

---

[12] The parties agreed to the accrual of interest at a rate of $0.55 per day, from May 13, 2022, through the date of payment.

[13] An amended judgment was necessitated by plaintiffs' post-judgment discovery that certain plaintiffs were now deceased, and that the identities of certain trustees and executors changed.

[14] The parties simultaneously engaged in settlement discussions involving three other then-consolidated cases, including *David H. Field Trust No. 1 v. United States*, No. 19-1202 (Fed. Cl.), which involved the same plaintiffs' counsel and was subsequently settled and dismissed.

[15] ArentFox did not submit litigation expenses for this period.

seek payment for hours attributed to client solicitation, unsuccessful efforts, duplicative and excessive work, and administrative or clerical tasks. Finally, the government avers plaintiffs' minimal success in this case warrants an additional reduction to plaintiffs' attorney's fee demand. At bottom, the government contends that attorney's fees should be capped at $2,531.72 (i.e., one-third of the $7,595.17 in damages awarded to plaintiffs as specified in the client retention agreements). The government's alternative calculation–using the lodestar method–posits that the maximum attorney's fees award should be $24,632.81[16]: based on the government's assessment of the applicable (local) billing rates multiplied by the *reasonable* hours expended, further reduced by 75% due to plaintiffs' minimal degree of success (i.e., $1 million claimed v. $7,595.17 awarded). Turning to the requested expenses, the government contends that recoverable expenses should be limited to $35,694.21 for ArentFox and $240.80 for Lewis Rice.

## DISCUSSION

### I.   Fee-Shifting Statute

"Congress has determined that in certain cases the prevailing parties may recover their attorney fees from the opposing side." *Haggart v. Woodley*, 809 F.3d 1336, 1354–55 (Fed. Cir. 2016) (citing 42 U.S.C. § 4654(c)). In enacting the URA, Congress established a uniform policy for the fair and equitable treatment of displaced landowners and persons whose property is permanently or temporarily taken for federal use or designated federal programs or projects. The URA is distinctively tied to the Fifth Amendment principle of just compensation and is designed to make plaintiffs whole. To that end, the URA's fee-shifting provision provides that plaintiffs are entitled to an award of reasonable attorney's fees and expenses for services rendered in vindicating their takings or condemnation claims:

> The court rendering a judgment for the plaintiff in a proceeding brought under section 1346(a)(2) or 1491 of Title 28, awarding compensation for the taking of property by a Federal agency, or the Attorney General effecting a settlement of any such proceeding, shall determine and award or allow to such plaintiff, as a party of such judgment or settlement, such sum as will in the opinion of the court or the Attorney General reimburse such plaintiff for his reasonable costs, disbursements, and expenses, including reasonable attorney . . . fees, actually incurred because of such proceeding.

42 U.S.C. § 4654(c).

---

[16] Using the government's proffered calculation, the $24,632.81 attorney fee award would be divided between the two law firms as follows: $18,770.81 payable to ArentFox and $5,862 to Lewis Rice.

The URA's fee-shifting provision ensures that plaintiffs with small takings claims can attract and retain the assistance of competent counsel. *See Bywaters v. United States*, 684 F.3d 1295, 1295 (Fed. Cir. 2012). As noted by the Federal Circuit: "litigation of these types of disputes serves a greater purpose (vindicating constitutionally protected property rights)." *Id.* at 1296. In determining awards of attorney's fees and recoverable expenses under federal fee-shifting statutes like the URA, trial courts have considerable discretion but "must 'provide a concise but clear explanation of its reasons for the fee award.'" *Biery v. United States*, 818 F.3d 704, 710 (Fed. Cir. 2016) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983)).

Fee-shifting statutes like the URA, however, "were not designed as a form of economic relief to improve the financial lot of attorneys, nor were they intended to replicate exactly the fee an attorney could earn through a private fee arrangement with his client." *Pennsylvania v. Del. Valley Citizens' Council for Clean Air*, 478 U.S. 546, 565 (1986) (*Delaware Valley I*), *as supplemented*, 483 U.S. 711 (1987); *accord Biery*, 818 F.3d at 710 ("Ultimately, a fee award must 'be adequate to attract competent counsel,' but must not 'produce windfalls to attorneys.'") (quoting *Hensley*, 461 U.S. at 444). Indeed, jurisprudence surrounding the award of reasonable attorney's fees and expenses pursuant to the URA and other fee-shifting statutes prevents windfalls and avoids situations where counsel are overcompensated through excessive or unreasonable fee requests. *See, e.g.*, *Davis Cnty. Solid Waste Mgmt. & Energy Recovery Special Serv. Dist. v. U.S. Env't Prot. Agency*, 169 F.3d 755, 758 (D.C. Cir. 1999) (*Davis County*) (recognizing exception to forum-rate rule to "prevent the occasional erratic result where the successful [plaintiff] is vastly overcompensated given the amount he contracted to pay for legal services"), *cited with approval in Avera v. Sec'y of Health & Hum. Servs.*, 515 F.3d 1343, 1349 (Fed. Cir. 2008) (adopting *Davis County* exception).

## II.   Contingent-Fee Arrangement

The government argues that the attorney's fees "actually incurred" as prescribed under the URA are limited to what *plaintiffs* actually committed to pay their counsel. Here, according to the government, the amount is therefore capped at the calculation specified in the ArentFox contingency-based retention agreement: one-third of the $7,595.17 in just compensation awarded to plaintiffs, or $2,531.72. The Court disagrees.

As an initial matter, as quoted *supra*, the cited retention agreement expressly entitles ArentFox to "the *greater* of *either*" one-third of the total damages award recovered by all plaintiffs (*including* interest *and* statutory attorney's fees) "*or*" "the statutory attorney fee determined by the Court." *See* ECF 188-1 at 3 (emphasis added). In seeking to limit attorney's fees to a percentage of the just compensation award in this case, the government's calculation ignores the plain language of the contingent-fee agreement; specifically, the inclusion of interest

and attorney's fee award in the "Total Award" and, more importantly, the disjunctive clause which expressly provides for the alternative recovery of attorney's fees under the URA.  Thus, per its express terms, plaintiffs' retention agreement does not cap or otherwise limit attorney's fees to a percentage of recovery.  *See, e.g.*, *Bywaters*, 670 F.3d at 1231–32 (contingent-fee agreement providing for "the greater of either" regular billing rates for hours expended "or" one-third of the damages award "did not cap attorneys' fees as a percentage of the recovery").

The Federal Circuit has not squarely addressed whether a contingent-fee arrangement imposes a cap on the recovery of attorney's fees under the URA.  *See Bywaters*, 670 F.3d at 1232 n.7 ("We need not decide in this case whether a contingent-fee agreement providing for fees based on a percentage of the [plaintiffs'] recovery would impose a limit on recovery of attorneys' fees under the URA, which . . . requires that the attorneys' fees be 'actually incurred.'").  Nevertheless, the law is clear that where the contingent-fee arrangement does not cap attorney's fees at a percentage of the damages award, it cannot be used as the sole (or even primary) factor to limit the recovery of attorney's fees.  *Id.* at 1232.  Instead, the financial arrangement between an attorney and their client "may be considered in calculating the lodestar figure."  *Id.*  The same applies in non-URA cases.  *See, e.g.*, *Blanchard v. Bergeron*, 489 U.S. 87, 93 (1989) (while a contingent-fee agreement can assist a court in determining the reasonableness of attorney's fees requested under the Civil Rights Act fee-shifting statute, 42 U.S.C. § 1988(b), the arrangement does not impose an "automatic ceiling" on the court's award of reasonable attorney's fees).

Finally, over twenty years ago this Court rejected a statutory interpretation of "actually incurred" similar to the interpretation advanced by the government here.  *See Preseault v. United States*, 52 Fed. Cl. 667, 673–77 (2002).  As explained in *Preseault*, under Federal Circuit precedent, "[attorney's] fees are '"incurred" within the meaning of a fee shifting statute when there is 'an express or implied agreement that the fee award will be paid over to the legal representative.'"  *Id.* at 673 (quoting *Phillips v. Gen. Servs. Admin.*, 924 F.2d 1577, 1582–83 & n.4 (Fed. Cir. 1991); *Raney v. Fed. Bureau of Prisons*, 222 F.3d 927, 933 n.4 (Fed. Cir. 2000) (en banc)).  The modification of "incurred" by the term "actually" does not limit recovery under the URA fee-shifting provision to attorney's fees actually billed to, paid by, or owed by the plaintiffs.  *See id.* at 675.  Instead, the phrase "actually incurred" in the URA context, properly interpreted, allows for the recovery of reasonable attorney's fees–commonly calculated using the lodestar method–for reasonable hours expended at reasonable rates in vindicating the plaintiffs' constitutional rights.  *See id.* at 675–77.

### III.   Lodestar Calculation

"Under a fee-shifting statute, the court calculates awards for attorney fees using the 'lodestar method' which is 'the product of reasonable hours times a reasonable rate.'" *Haggart*, 809 F.3d at 1355 (quoting *City of Burlington v. Dague,* 505 U.S. 557, 559–60 (1992) (quoting *Delaware Valley I*, 478 U.S. at 565)); *accord Bywaters*, 670 F.3d at 1228–29 ("In determining the amount of reasonable attorneys' fees under federal fee-shifting statutes, the Supreme Court has consistently upheld the lodestar calculation as the 'guiding light of [its] fee-shifting jurisprudence.'") (quoting *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 551 (2010)). Plaintiffs bear the burden of documenting the hours expended on the litigation with the requisite specificity to enable meaningful review and demonstrating the reasonableness of those hours as well as the claimed hourly rates. *See Hensley*, 461 U.S. at 437. "A fee award that is determined through the use of a lodestar calculation carries a 'strong presumption' that it represents a 'reasonable' attorney fee." *Biery*, 818 F.3d at 710 (quoting *Bywaters*, 670 at 1229).

### A.   Hourly Rates

Courts generally employ forum rates to calculate attorney's fee awards under fee-shifting statutes. *Avera*, 515 F.3d at 1348 (citing cases). More specifically, courts look to the "prevailing market rate" of the forum court in assessing the reasonableness of the hourly rates claimed by counsel for the prevailing party. *Id.* "'[T]he prevailing market rate' [is] defined as the rate 'prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation.'" *Id.* (quoting *Blum v. Stenson*, 465 U.S. 886, 896 n.11 (1984)). The United States Court of Federal Claims–which exercises exclusive jurisdiction over this Fifth Amendment takings action under 28 U.S.C. § 1346(a)(2)–is located in Washington, DC. However, that this Court sits in Washington, DC and has nationwide jurisdiction does not dictate that Washington, DC or national rates apply in every case.

An exception to the forum court prevailing market rate lies where, as here, "the bulk of the work is done outside of the District of Columbia in a legal market where the prevailing attorneys' rates are substantially lower." *See Avera*, 515 F.3d at 1349 (adopting *Davis County* exception in Vaccine Act case litigated in the Court of Federal Claims where legal services were performed entirely in Cheyenne, Wyoming, and the prevailing market rates in Cheyenne were significantly lower than the requested Washington, DC rates). Plaintiffs' counsel performed the vast majority of their work in St. Louis, Missouri–a legal market where the prevailing hourly rates are significantly lower than those in Washington, DC. Accordingly, the Court employs the *Davis County* exception in this case.

1.    *Bulk of the Work: Performed in St. Louis, Missouri*

Plaintiffs do not contend or proffer any evidence that most of the legal work in this case was performed in Washington, DC.  On the contrary, according to plaintiffs: "Prior to January 2019, Megan Largent was the primary attorney timekeeper on this matter, and a large percentage of the fees related to work that was performed by Ms. Largent in successfully litigating these claims."  ECF 196 at 21.  During this time, Ms. Largent was employed by ArentFox and worked in the firm's St. Louis office until around the time that office closed in early 2019.  *See* ECF 196-7 at ¶ 2; ECF 196-4 at ¶ 3.  In January 2019, Ms. Largent moved her practice to the Missouri-based law firm Lewis Rice.[17]  ECF 196-7 at ¶ 2.  After January 2019, while at Lewis Rice, Ms. Largent continued to serve as the primary attorney handling this case, representing 11 of the 13 remaining plaintiffs.  *See* ECF 196 at 25–26 (proffering Ms. Largent is responsible for 219.1 hours out of 340.5 hours claimed by Lewis Rice–more than ten-fold the hours claimed by any of the other 11 Lewis Rice timekeepers); ECF 196-7 at ¶ 2 ("While at Arent Fox [sic], I served as counsel-of-record for all thirteen (13) Plaintiffs from March 14, 2017 until January 2019.  Upon moving my practice to Lewis Rice LLC in January 2019, I continued to represent eleven (11) of the thirteen (13) Plaintiffs in this matter as counsel-of-record.") (internal citations omitted).  Mr. Hearne, the second most prolific timekeeper in this entire case, served as counsel-of-record for all plaintiffs prior to March 14, 2017, during his time at ArentFox.  When filing this case, Mr. Hearne provided the Court with ArentFox's St. Louis office as his business address.[18]

After January 2019, only 2 of 13 plaintiffs remained with ArentFox, and the matter was referred to the firm's Washington, DC office due to the closure of its St. Louis Office.  Compared with the 340.5 hours claimed by Lewis Rice, ArentFox claimed only 142.6 hours for this matter after January 2019.  *Compare* ECF 196-5 (Lewis Rice billing spreadsheet) *with* ECF 196-2 (ArentFox billing spreadsheet).  Both data points are dwarfed by the 1,351.3 hours claimed by ArentFox (St. Louis office) between October 2015 and December 2018.  *See* ECF 196-1 (ArentFox billing spreadsheet).  In sum, out of the 1,834.4 hours claimed in this case, 142.6 hours were purportedly attributable to services performed in ArentFox's Washington, DC office following the closure of its St. Louis office.  Moreover, throughout the seven-year pendency of this case, all court proceedings were conducted telephonically, obviating the need for counsel to travel to Washington, DC to attend

---

[17] Lewis Rice's website highlights that the firm was founded in St. Louis and lists the firm's primary offices in St. Louis and Kansas City, Missouri.  *See* https://www.lewisrice.com/offices/ (last visited Oct. 24, 2022).

[18] Around 2018, Mr. Hearne moved his practice to another St. Louis-based law firm, which shares the same St. Louis business address Mr. Hearne listed in the records of this case during his time at ArentFox.  *See* https://truenorthlawgroup.com/meet-our-firm/ (last visited Oct. 24, 2022).

any case-related proceedings.  Accordingly, the Court concludes that the bulk of the work in this case was performed in St. Louis for purposes of applying the *Davis County* exception.

        2.      *Legal Market Prevailing Rates: St. Louis v. Washington, DC*

        Plaintiffs request reimbursement of the hourly rates established by ArentFox and Lewis Rice for their respective attorneys and professionals, describing them as "the usual and customary rates billed by each timekeeper during the relevant time period rather than rates for this particular case."  ECF 196 at 23, 27; *accord* ECF 196-4 at ¶ 4; ECF 196-8 at ¶¶ 3–5.  For the period commencing January 2019, plaintiffs claim the following hourly rates for Lewis Rice:

| Timekeeper | Title | Rate per Hour by Year[9] | | | |
|---|---|---|---|---|---|
| | | 2019 | 2020 | 2021 | 2022 |
| Meghan S. Largent | Member | $ 570.00 | $ 595.00 | $ 645.00 | $ 660.00 |
| Lindsay S.C. Brinton | Member | $ 550.00 | $ 585.00 | $ 635.00 | $ 660.00 |
| Michael Armstrong | Associate/Member | $ 395.00 | $ 430.00 | $ 460.00 | $ 495.00 |
| Sarah L. White | Associate | $ 250.00 | | | |
| Katherine G. McWherter | Associate | $ 215.00 | | | |
| Evan P. Jefferson | Associate | | | | $ 225.00 |
| Florencia Rubio | Paralegal | $ 150.00 | $ 170.00 | | |
| Ebony Allen | Paralegal | | $ 185.00 | | |
| Meredith Shrinivas | Paralegal | | $ 200.00 | $ 200.00 | $ 210.00 |
| Anna Roland | Paralegal | | $ 115.00 | $ 115.00 | $ 125.00 |
| Amanda Welker | Paralegal | | | | $ 125.00 |
| Courtney Ham | Paralegal | | | | $ 210.00 |

*See* ECF 196 at 27.[19]  As for ArentFox, plaintiffs assert the following hourly rates applied throughout the pendency of this action:

---

[19] Footnote "9" denoted in the chart explains that the claimed Lewis Rice hourly rates are based on the firm's fiscal year (i.e., February 1 to January 31).

| Timekeeper | Law School Grad Year | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|---|---|---|
| **Partner** | | | | | | | | | |
| Albin-Riley, Debra | 1983 | 670 | 695 | 725 | 760 | 795 | | | |
| Hart, Kirsten A. | 2008 | | 480 | | | | | | |
| Hearne II, Mark "Thor" F. | 1986 | 555 | 580 | 610 | 645 | | | | |
| Hulme, James H. | 1979 | | | | | 835 | 870 | 905 | 955 |
| **Of Counsel** | | | | | | | | | |
| Brinton, Lindsay S. | 2006 | 395 | 425 | 455 | 490 | | | | |
| Largent, Meghan S. | 2005 | 415 | 445 | 475 | 510 | | | | |
| Pafford, Abram J. | 1999 | | | 600 | | 670 | | | |
| **Associate** | | | | | | | | | |
| Davis, Stephen S. | 1999 | | 395 | 435 | 480 | | | | |
| LaMontagne, Laurel | 2014 | | | | | 380 | 430 | 485 | |
| Pankow, Morgan R. | 2016 | | | | | | 395 | 445 | 515 |
| **Specialist** | | | | | | | | | |
| Marc, Anderson | | | 180 | | | | | | |
| **Paralegal** | | | | | | | | | |
| Barney, Alexandrea | | 165 | 170 | | | | | | |
| Epperson, Megan M. | | | 220 | 230 | 240 | | | | |
| Hitt, Jack A. | | | | | | | 340 | 350 | 380 |
| Kessler, Samantha | | | | | | 155 | 175 | 185 | |
| Manzanares, Chiarra | | 180 | 185 | | | | | | |
| Matuszkiewicz, Joanna | | 170 | | | | | | | |
| May, Christy E. | | 260 | 270 | | | | | | |
| Shambro, Mary B. | | 270 | 280 | 290 | 300 | | | | |
| Yearwood, David A. | Para in 2017 | | 290 | | | | | | |
| **Project Assistant** | | | | | | | | | |
| Levin, Alexandra D. | | | 160 | 165 | | | | | |
| Payne, Katherine A. | | | | 155 | 160 | | | | |
| Woodruff, Cody | | | | | | | | 160 | |
| Reyes, Karen E. | | | | | | 185 | | | |

*See* ECF 196 at 23.

In support of their claimed rates, plaintiffs submitted culled billing spreadsheets for ArentFox and Lewis Rice timekeepers as well as declarations from counsel of record (Ms. Largent and Mr. Hulme) and the Chairman of Lewis Rice (Richard B. Walsh, Jr.). *See* ECF 196-1 to 196-8. According to Mr. Hulme:

> ArentFox [] establishes hourly rates for all of the attorneys in the firm, including partners, associates, of counsel attorneys, as well as paralegals. These hourly rates are established and reviewed annually. Firm management establishes these hourly rates based upon significant analysis and research of the legal marketplace. . . . The hourly rates are rates which are competitive hourly rates justified by the rates private clients pay for comparable legal representation in the prevailing legal marketplace.

ECF 196-4 at ¶ 4.

Similarly, Ms. Largent states: "All of the time entries contained in [Lewis Rice's billing spreadsheet] are reasonable and consistent with the prevailing market rates charged in the St. Louis legal market for such services."  ECF 196-7 at ¶ 8.  Mr. Walsh, in turn, represents:

> [E]ach year [Lewis Rice] review[s] data on the hourly rates charged by other law firms in the St. Louis region and adjust[s] Lewis Rice's rates to be consistent with local standards.
>
> . . .
>
> . . . Based on my knowledge of the market and annual review of similar local firms' rates, each of the rates above is reasonable and consistent with the St. Louis market standard rates for other legal professionals with comparable skill and experience.

ECF 196-8 at ¶¶ 3, 6.  In support of these self-serving statements, plaintiffs cite the United States Attorney's Office Matrix (2015–2021),[20] the Laffey Matrix (June 1, 1994–May 31, 2023),[21] and the Fitzpatrick Matrix (2013–2021)[22]—each of which is based on rates for either the greater Washington, DC metropolitan area or the District of Columbia.  Nevertheless, even these data largely reflect hourly rates lower than those claimed by ArentFox and Lewis Rice.

Regarding ArentFox's proffered rates, regardless of whether the firm's advertised (national) rates are consistent with or excessive relative to other firms' rates in the Washington, DC market, plaintiffs must demonstrate that their requested rates are reasonable–i.e., "'prevailing in the [relevant] community

---

[20] *See* www.justice.gov/file/1461316/download (last visited Oct. 24, 2022).

[21] *See* http://www.laffeymatrix.com/see.html (last visited Oct. 24, 2022).

[22] *See* https://www.justice.gov/usao-dc/page/file/1189846/download (last visited Oct. 24, 2022).

for similar services by lawyers of reasonably comparable skill, experience, and reputation.'"  *See Avera*, 515 F.3d at 1348 (quoting *Blum*, 465 U.S. at 896).  For the reasons set forth in the preceding section, moreover, the proper comparison thus lies not with other law firms in Washington, DC (or nationally), but with the hourly rates applicable to law firms in the St. Louis area for the same or similar services. Plaintiffs have not provided the Court the necessary information or data enabling the apt comparison or analysis, and the requested ArentFox rates lack reliable support.  The claimed Lewis Rice rates are similarly unsubstantiated.  Although Lewis Rice is based in St. Louis, Ms. Largent's and Mr. Walsh's unsupported and conclusory representations regarding the reasonableness of their firm's hourly rates, quoted *supra*, are insufficient for the Court to summarily adopt the proposed rates as reasonable for comparable legal services in the St. Louis market.

Notably, when asked, plaintiffs declined to provide the government with information or underlying data supporting counsel's representations regarding the requested hourly rates and, thereafter, opposed (and litigated) the government's request for discovery on this issue.  Although the Court denied the government's motion to *compel* discovery, *see* ECF 200, the burden of demonstrating the reasonableness of the claimed rates rests on the plaintiffs at all times.  *See Biery*, 818 F.3d at 715 ("It was [plaintiffs'] counsel's burden to provide evidence tending to show an appropriate rate in the St. Louis area. . . .  When a party has a burden of production, it must submit evidence in order to meet the burden.") (internal citation omitted).

The government counters that the Court should adopt the "market rates for real estate litigation work by St. Louis practitioners" in any lodestar calculation in this case, and proposes the following "market-based" rates:

| Years of Experience | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|---|---|
| 21+ | $273 | $271 | $280 | $285 | $309 | $323 | $317 | $338 |
| 9 to 20 | $254 | $252 | $260 | $264 | $292 | $306 | $304 | $324 |
| 7 to 8 | $168 | $173 | $175 | $192 | $191 | $198 | $195 | $207 |
| 3 to 6 | $165 | $170 | $172 | $188 | $188 | $195 | $192 | $204 |
| Less than 3 | $160 | $164 | $166 | $183 | $182 | $189 | $186 | $198 |
| Paralegal | $60 | $56 | $74 | $84 | $92 | $90 | $103 | $109 |

ECF 204 at 27.  In support of the proposed rates, the government relies upon the declaration of Laura A. Malowane, Ph.D., a noted economist and an attorney who represents that she has "extensive experience in analyzing and testifying on issues relating to the awarding of attorney['s] fees . . . ."  ECF 204-1 at ¶ 2.  The government contends that the above rates ascertained by Dr. Malowane represent the hourly rates "*actually paid* to St. Louis practitioners in cases, like this one, that involve real estate litigation."  ECF 204 at 26 (emphasis in original).  The

government further cites Dr. Malowane's proffered opinion that the "rack rate" plaintiffs seek in this case "far exceeds the market rate (i.e., the amount actually paid by clients) for real estate litigation work by St. Louis attorneys." *Id.* at 27.

The Court places limited weight on the government's proffered expert analysis and opinion. In her declaration, Dr. Malowane notes she is relying on a single national survey–i.e., Real Rate Report (2016, 2018, 2020, and 2021 editions)– that offers analyses on law firm rack rates as compared to actual collected rates, staffing, and billing practice in major markets including, relevant here, St. Louis. *See* ECF 204-1 at ¶¶ 22–23. Although relevant, the singular resource, without pressure tests against other available data sources, is not determinative.

Furthermore, the Court notes that plaintiffs' counsel (ArentFox) previously retained Dr. Malowane to support *their* application for attorney's fees requesting "'national' hourly rates based on a 'national' market" in other rails-to-trails cases for legal services provided, like here, primarily in St. Louis. *See Biery v. United States*, Nos. 07-693 & 07-675, 2014 WL 12540517 at *8 (Fed. Cl. Jan 24, 2014); *Biery v. United States*, Nos. 07-693 & 07-675, 2012 WL 5914260 at *4 (Fed. Cl. Nov. 27, 2012) (citing Dr. Malowane's declaration opining that ArentFox should recover the firm's national hourly rates and that the requested rates are reasonable and comparable to other firms' national rates); *see also Whispell Foreign Cars, Inc. v. United States*, 139 Fed. Cl. 386, 390 (2018) (noting ArentFox's reliance upon Dr. Malowane's opinion). Accordingly, the Court assesses Dr. Malowane's proffered expert opinion with a heightened degree of skepticism.

Finally, as discussed *infra*, the government's proposed rates are at odds with attorney's fees recently awarded by various district courts in Missouri. The government's proposal is also discordant with St. Louis rates published in the most recent editions of *Missouri Lawyers Media*, which this Court previously found reliable in assessing reasonable St. Louis rates in rails-to-trails cases. *See, e.g.*, *Whispell Foreign Cars*, 139 Fed. Cl. at 400 ("The court concludes that the average St. Louis hourly rates for attorneys, as presented in the *Missouri Lawyers Weekly* surveys, provide a reasonably reliable basis for establishing appropriate rates in this case."); *Bratcher v. United States*, 136 Fed. Cl. 786, 800 (2018) (considering attorney rate ranges and average rates listed in *Missouri Lawyers Weekly* survey, finding them consistent with Missouri federal district court attorney's fee awards).

In evaluating the parties' contrasting proposals, the Court finds that recent attorney's fee awards in Missouri district courts provide relevant and helpful comparison. *See Biery*, 818 F.3d at 715 (Court of Federal Claims did not abuse its discretion in turning to attorney's fees awarded in the Eastern District of Missouri to determine appropriate hourly rates in St. Louis). In a recent § 1983 civil rights case brought in the Eastern District of Missouri (i.e., alleged unlawful arrest and excessive force), the court awarded attorney's fees at rates of: $500–$595 an hour

for experienced civil rights lawyers who handled the summary judgment motion, the appeal to the United States Court of Appeals for the Eighth Circuit, and the subsequent jury trial; $250–$450 an hour for junior attorneys who worked on the case; and $250 an hour for paralegals assigned to the matter. *See Gerling v. Waite*, No. 17-2702, 2022 WL 558083 at *2 (E.D. Mo. Feb. 24, 2022) (citing cases where reasonable attorney's fee awards were based on hourly rates ranging from $350–$575 for experienced and senior litigators and rates of up to $375 an hour were appropriate for more junior associates).

Similarly, in a § 1983 class action filed and eventually settled in the Western District of Missouri (i.e., allegations involving administration of psychotropic drugs to children in foster care), the court awarded attorney's fees at the hourly rates of $400–$500 for the most senior litigators; $200–$350 for junior associates, and $150 for paralegals. *See M.B. v. Tidball*, No. 17-4102, 2020 WL 1666159 at *10–14 (W.D. Mo. April 3, 2020). In adopting the $500 hourly rate for the most senior attorneys, the court noted that the attorneys had more than 30 years of experience, including experience serving as counsel in numerous class actions alleging constitutional and federal statutory violations, and further cited the uniquely technical and complex nature of the case. *Id.* at *10.

*Gerling* and *Tidball* are representative of the hourly rates adopted by federal courts in Missouri in determining attorney's fees awards, particularly in complex cases. *See, e.g.*, *S.C. v. Riverview Gardens Sch. Dist.*, No. 18-4162, 2020 WL 5262267, at *9 (W.D. Mo. Sept. 3, 2020) (awarding law firm partner with 25 years of civil litigation experience an hourly rate of $475, rather than $700 requested, and more junior associates an hourly rate of $200–$300 in § 1988 action involving alleged denial of education to homeless children that ultimately settled); *Dinosaur Merch. Bank Ltd. v. Bancservices Int'l LLC*, No. 19-84, 2020 WL 3489344, at *6 (E.D. Mo. June 26, 2020) (reducing New York market rates proffered by counsel from $475–$800 to $380–$645 per hour in a "basic breach of contract" action). The Court finds this body of caselaw on point and persuasive.

Consistent with relevant caselaw, the Court also considers the St. Louis billing rates published in *Missouri Lawyers Media* (Aug. 2019 & Nov. 2021). *E.g.*, *Ascentium Cap. LLC v. Littell*, No. 20-4215, 2022 WL 1087424, at *2 (W.D. Mo. Apr. 11, 2022); *Sheppard v. U.S. Dept. of Justice*, No. 17-1037, 2022 WL 245480, at *2 (W.D. Mo. Jan. 25, 2022); *Hardy v. United States*, 157 Fed. Cl. 464, 472–73 (2021). These surveys provide hourly rate data for attorneys and law firm professional staff throughout the state of Missouri, including St. Louis and Kansas City.[23] According to the August 2019 survey, the median hourly rates

---

[23] The "Methodology" section of the surveys explains that *Missouri Lawyers Media* gathers hourly rates from attorney's fees applications filed with courts in Missouri within the past year; rate information generally comes from bankruptcy cases, class-action lawsuits, and cases where the

for attorneys based in St. Louis was $390 for partners and $298 for associates. *See Billing Rates 2019*, MO. LAW. MEDIA, Aug. 2021, at BR2. The median hourly rate across the state of Missouri was $370 per hour. *Id.* The 2019 survey also provides that the median hourly rate for support staff was $175. *Id.* The November 2021 survey provides that the median hourly rate for attorneys based in St. Louis increased to $450 for partners and decreased to $250 for associates. *See Billing Rates 2021*, MO. LAW. MEDIA, Nov. 2021, at BR2. The median hourly rate in all of Missouri decreased to $330 per hour. *Id.*

The hourly rates adopted by district courts in Missouri in calculating attorney's fee awards, and the billing rates published by *Missouri Lawyers Weekly*, are consistent with the St. Louis hourly rates recently assessed by this Court in similar rails-to-rails cases litigated by many of the same counsel in this case. *See, e.g.*, *Bratcher*, 136 Fed. Cl. at 800–01; *Whispell Foreign Cars*, 139 Fed. Cl. at 400–01. For the reasons stated above, and in view of the nature of the issues litigated in this case as detailed in this opinion, this Court concludes that the reasonable rates for the services of counsel and other professionals in this case are as follows:

| Timekeeper | Requested Rate | Adjusted Rate |
|---|---|---|
| **Partner** | | |
| Albin-Riley, Debra | $670–$795/hour | $500/hour |
| Hearne II, Mark F. | $555–$645/hour | $500/hour |
| Hulme, James H. | $835–$955/hour | $500/hour |
| Largent, Meghan S. | $415–$660/hour | $450/hour |
| Brinton, Lindsay S. | $395–$660/hour | $450/hour |
| Hart, Kirsten A. | $480/hour | $400/hour |
| **Of Counsel** | | |
| Pafford, Abram J. | $600–$670/hour | $350/hour |
| **Associate** | | |
| Davis, Stephen S. | $395–$480/hour | $300/hour |
| Armstrong, Michael | $395–$495/hour | $300/hour |
| LaMontagne, Laurel | $380–$485/hour | $275/hour |
| Pankow, Morgan R. | $395–$515/hour | $275/hour |
| White, Sarah L. | $250/hour | $250/hour |
| Jefferson, Evan P. | $225/hour | $225/hour |
| McWherter, Katherine G. | $215/hour | $215/hour |

prevailing party was able to request reimbursement of attorney's fees and expenses under a fee-shifting statute. *Billing Rates 2019*, MO. LAW. MEDIA, Aug. 2021, at BR2; *Billing Rates 2021*, MO. LAW. MEDIA, Nov. 2021, at BR2. "Where possible, [*Missouri Lawyers Media*] use[s] the attorney's standard or customary rates, rather than the rate the court applied, or discounted rates offered to a particular client." *See* Scott Lauck, *Billing Rates 2021: Fee awards few and far between during pandemic*, MO. LAW. MEDIA, 2021 WLNR 37503966 (Nov. 29, 2021) (comparing 2019 and 2021 hourly rates).

| Other | | |
|---|---|---|
| Paralegal/Specialist | $115–$380/hour | $150/hour |
| Project Assistant | $155–$185/hour | $100/hour |

The chart above lists plaintiffs' counsel by position and years of experience and, as adjusted: partners with 25 or more years of experience a rate of $500 per hour; partners with 15-25 years of experience a rate of $450 per hour; and partners with less than 15 years of experience a rate of $400 per hour.[24]  The Court determines for Abram J. Pafford–designated "Of Counsel"–a reasonable rate of $350 per hour, accounting for Mr. Pafford's over 20 years of experience.  For more junior attorneys, the Court finds their requested rates of $250 per hour or less reasonable, and that the reasonable rate for the several associates with relatively more experience is $275 per hour.  Accounting for their years of experience and transitions to partnership, the Court finds the reasonable rate for Stephen S. Davis and Michael Armstrong–designated "associates"–to be $300 per hour.  For supporting professionals, the Court finds a reasonable rate for paralegals and specialists to be $150 per hour, and for project assistants $100 per hour, in view of the respective work provided and the skills required.  These rates are substantially lower than the Washington, DC (or national) rates requested by plaintiffs' counsel at ArentFox.

### B.    Compensable Hours

Plaintiffs bear the burden of establishing that their URA attorney's fee application seeks reimbursement only for "appropriate hours expended."  *Hensley*, 461 U.S. at 437.  In this case, plaintiffs request reimbursement of 1,834.4 hours (i.e., 1,493.9 hours for ArentFox and 340.5 hours for Lewis Rice).  The government contends that plaintiffs' application includes hours expended on several categories of non-compensable work, including time devoted to client solicitation, unsuccessful claims and efforts, excessive and duplicative hours, wasteful and unnecessary efforts, administrative tasks, and vague time entries.  The government further contends that plaintiffs' minimal success in this case (i.e., $1 million initial demand versus $7,595.17 ultimate recovery) warrants an additional significant deduction.  The Court addresses each of these issues seriatim.[25]

---

[24] The Court designated Ms. Largent and Lindsay S. Brinton as "partners" to account for their transition to "Members" of Lewis Rice in or about 2018 or 2019.

[25] By Order dated March 31, 2022, this Court directed plaintiffs' counsel to attribute, where possible, claimed compensable hours (and expenses) to specific docket entries (ECF No(s).) to facilitate the Court's review and assessment of their URA attorney's fees application.  *See Arnold*, No. 15-1252, ECF 170.

### 1.    Client Solicitation

Time devoted to soliciting potential clients and exploring business opportunities is not compensable under the URA.  *See Preseault*, 52 Fed. Cl. at 671 ("Section 4654(c) does not provide for the reimbursement of expenses incurred by plaintiffs before their decision to file suit in the Court of Federal Claims.") (citing *Yancey v. United States*, 915 F.2d 1534, 1543 (Fed. Cir. 1990); *Emery v. United States*, 526 F.2d 1121, 1124 (Ct. Cl. 1975)); *see, e.g.*, *Campbell v. United States*, 138 Fed. Cl. 65, 71 (2018) (disallowing hours expended on client solicitation and development).  In private practice, such hours are not customarily submitted to a paying client.  The URA requires no less reasonable billing judgment and ethical discipline in determining compensable hours.  Put simply: "Hours that are not properly billed to one's *client* also are not properly billed to one's *adversary* pursuant to statutory authority."  *Hensley*, 461 U.S. at 434 (quoting *Copeland v. Marshall*, 641 F.2d 880, 891 (D.C. Cir. 1980) (*en banc*) (emphasis in original), *quoted in Whispell Foreign Cars*, 139 Fed. Cl. at 395 (disallowing hours claimed for soliciting–as opposed to representing–clients).

On October 27, 2015, five days after the NITU was issued, counsel at ArentFox filed the complaint on behalf of the then-sole Dawson plaintiff.[26]  In the weeks and days leading up to the filing of the original complaint, counsel billed 48.7 hours, the majority of which dedicated to, inter alia, "[l]ocation scouting for property meetings for all four counties," "[s]chedul[ing] travel to Nebraska and Kansas," preparing for and meeting and corresponding with landowners in various counties, and "[a]nalyz[ing] STB map with list of landowners regarding discontinued rail and abandoned rail."  *See* ECF 196-1 at 2–3.  These hours clearly represent counsel's client solicitation and business development efforts, as opposed to the firm's representation of retained clients.  Counsel at ArentFox thereafter continued the firm's year-long effort to track the regulatory process, investigate the land near the rail segment in various counties in Nebraska and Kansas, discover the corresponding landowners, and solicit and retain a subset of these property owners as clients.  ArentFox's billing records document the firm's continued business development efforts into 2016, as counsel solicited, retained, and added 18 plaintiffs to this case.[27]

---

[26] The record does not include information specifying when the first Dawson plaintiff retained counsel at ArentFox to draft and file the original complaint.  Of the 19 plaintiffs eventually named in this lawsuit, the record contains only the Dials' retention agreement dated May 6, 2016.  *See* ECF 188-1.

[27] *See* ECF 15, 18, 24; *see, e.g.*, ECF 196-1 at 3–23 (various time entries for, inter alia, traveling to and from Kansas and Nebraska for "meeting[s] with landowners," monitoring STB docket, reviewing "STB maps for entire rail line" and researching "landowners for entire rail line," preparing "marketing materials," arranging and attending "city [hall, or town] meeting[s]," "sending postcard out about upcoming meeting," managing "solicitation[s]" to landowners and "plaintiff report,"

Counsel's billing records further include various entries for retrieving, managing, or analyzing property records (i.e., "deeds," "conveyances," "maps," "property data").[28]  Similar to the generically narrated entries of "correspondence" with landowners or clients, these entries do not contain sufficient distinction between compensable effort dedicated to advancing claims of retained clients and non-compensable time facilitating counsel's efforts to identify or select landowners for recruitment.  ArentFox's billing records also include entries dedicated to tracking competing firms' filings and client lists.[29]  For retained clients, the billing records include dozens of entries reportedly devoted to reviewing or analyzing engagement letters.  *See generally* ECF 196-1.  This collection of conflated non-compensable and questionable entries reflects the majority of the billable hours submitted by ArentFox between October 2015 and October 2016.

By October 26, 2016, when plaintiffs filed their third amended complaint, counsel billed a total of 626.1 hours–representing $199,100 in claimed legal fees.[30] The Court recognizes that the 626.1 hours billed as of filing of the third amended

---

[27] gathering and reviewing "new property owner [landowner] information," reviewing "press and media release" or researching "local newspapers," researching and corresponding with "state representatives" or "city and county attorneys," maintaining case and "client data," "correspondence" with unspecified landowners and unspecified nature of communication).  In the few billing entries indicating the nature of the correspondence, counsel included time expended on claims ultimately dismissed.  *See, e.g.*, 196-1 at 9 ("Draft letter to client M. Christensen. Revise same."); *id.* at 19 ("Review client correspondence regarding dismissal . . . ."); *id.* at 21 ("Draft and finalize status letters regarding voluntarily dismissal. . . .").

[28] *See e.g.*, *id.* at 3 ("Manage various val [sic] maps, STB map and reports of landowners"); *id.* at 10 ("Review maps, valuation schedules, deeds, and property records"); *id.* at 11 ("Work on preparation of upcoming meeting and marketing materials, analyze deeds and tax receipts received from Norton and Harlan County, follow up missing deeds from Phillips County"); *id.* at 12 ("Analyze east, west and central maps from experts and compare all landowners and request research for new landowners [sic] address . . . ."); *id.* at 19 ("Review deed and title work and tax records"); *id.* at 13 ("Correspond with Harlan, Phillips, Norton and Decatur Recorder of Deeds Office"); *id.* at 16 ("Manage individual clients' deeds and tax receipts, review exhibit maps from experts").

[29] *See, e.g.*, ECF 196-1 at 3 ("Review complaint filed by other counsel," "Analyze competing firm's complaint and filed documents regarding landowners needing to be removed from our solicitation and work on website blog to advertise our case"); *id.* at 9 ("Review companion cases"); *id.* at 15 ("analyze with client list and competing firms [sic] client lists," "analyze competing firms' cases on the US Court of Claims website," "research competing firms' plaintiffs on amended complaint to ensure no future solicitation and review competing firm's pleadings"); *id.* at 16 ("Analyze second amended complaint filed by competing firm regarding new clients to ensure we do not solicit"); *id.* at 19 ("Review list of clients to whom we communicated 'no representation' based on location").

[30] Based on the record presented, counsel's solicitation effort did not generate additional clients after October 2016.  The fourth and fifth amended complaints reorganized plaintiff and parcel information but did not add additional plaintiffs.  *See* ECF 33; ECF 62.  Other than adding and then reorganizing landowners and parcel information, the six complaints are substantively similar. *Compare* ECF 1 *with* ECF 15 *and* ECF 18 *and* ECF 24 *and* ECF 33 *and* ECF 62.

complaint necessarily includes certain compensable work while counsel: engaged in substantive discussions with retained clients, conducted investigations to develop the case, researched and drafted court filings, and communicated with government counsel. The billing records presented, however, do not delineate between hours devoted to compensable client representation and non-compensable client recruitment and business development. As highlighted above, the billing records submitted are replete with entries properly categorized as the latter. Based on the record presented–reflective of plaintiffs' failure to meet their burden of documenting billable hours limited to compensable client *representation* hours– the Court finds that a 60% reduction of the hours billed as of October 26, 2016, is warranted.[31]

### 2.   *Unsuccessful Claims and Wasteful Effort*

Fee-shifting statutes like the URA do not permit reimbursement of hours expended on unsuccessful claims. *Hensley*, 461 U.S. at 435 ("no fee may be awarded for services on the unsuccessful claim[s]"). In this case, the original complaint with *one* plaintiff claimed monetary relief estimated at $1 million. Although the case ultimately involved upwards of 19 plaintiffs and 25 claims, in the course of this litigation, six plaintiffs and claims involving eight distinct parcels of land were voluntarily dismissed. The parties ultimately settled the remaining 17 claims brought by 13 plaintiffs in the aggregate amount of $7,595.17. Because the unsuccessful claims involved different parcels of land and, in most cases, different plaintiffs, the hours expended on those unsuccessful claims must be excluded from the lodestar calculation. *See Biery*, 818 F.3d at 712 ("There is no dispute that work done on behalf of the unsuccessful plaintiffs is not recoverable."); *Bratcher*, 136 Fed. Cl. at 793 (same for unsuccessful claims).

Counsel's billing records do not specify the claim(s) or piece(s) of property on which the claimed hours were expended, or how the time billed was allocated among the claims.[32] Notably, despite the fact that all claims involving Nebraska landowners were dismissed–and, therefore, definitively unsuccessful–counsel request reimbursement for hours spent traveling to Nebraska, meeting with Nebraska landowners, researching Nebraska law, investigating Nebraska properties, and correspondence with Nebraska landowners. Previously commenting

---

[31] By the time the fifth and final amended complaint was filed on July 20, 2017, counsel billed a total of 1,025.8 hours. The roughly 400 hours billed between the filing of the third and the fifth amended complaints includes time associated with: plaintiffs' summary judgment briefing on liability, which the Court denied as premature; and the parties' unsuccessful settlement negotiations. No additional plaintiffs were added during this period. Although other bases for hour reductions apply, discussed *infra*, no further reduction for client solicitation is imposed for the post-October 26, 2016 period.

[32] Most billing entries cite generic descriptions of work devoted to unspecified "landowner," "client," or "property."

upon this issue in cases involving the same counsel, this Court noted the difficulty of allocating compensable hours when counsel's billing records fail to delineate hours between successful and unsuccessful claims and counsel make no effort to claim only what they are entitled to recover.  *See, e.g.*, *Bratcher*, 136 Fed. Cl. at 793 ("Plaintiffs' time records do not specify the claims or parcels of property to which the recorded hours pertain."); *Biery*, 2014 WL 12540517, at *5 (noting counsel's failure to delineate between hours expended on successful and unsuccessful claims or parcels of land).  Consistent with the governing caselaw, the Court finds that plaintiffs' request warrants a percentage adjustment to account for the unsuccessful claims.  *See, e.g.*, *Biery*, 818 F.3d at 712 ("[T]he Court of Federal Claims did not abuse its discretion when it reduced the hours and costs by 30% in order to take into account work done on behalf of the unsuccessful plaintiffs.").  Here, 32% of the claims filed (i.e., 8 of 25) were voluntarily dismissed and, therefore, not successful.  Accordingly, the court imposes a 25% reduction on the hours billed as of June 25, 2018 (i.e., the date the parties stipulated to the dismissal of the eighth claim).[33, 34]

The government proposes a further reduction to account for counsel's efforts that did not contribute to any favorable result for plaintiffs in this case.  The Court agrees.  During the title resolution phase of this case, the Court directed the parties to limit their cross-motions for partial summary judgment to title issues.  Despite the Court's express instructions, plaintiffs filed a more comprehensive dispositive motion on liability.  The Court summarily denied plaintiffs' motion as premature and ordered revised briefing consistent with the Court's instructions.  *See* ECF 55.  Nevertheless, included in counsel's URA reimbursement request are at least 86.5 hours attributable to the rejected brief and, despite repurposing a number of identical passages and arguments in the revised filing, counsel billed at least another 129.4 hours for the revised motion.[35]  *Compare* ECF 37 *with* ECF 65.

Notably, for the 17 claims where the 13 landowners ultimately recovered just compensation, the parties resolved the title issues largely through stipulation rather than litigation.  Thereafter, the parties disputed the applicable liability determination framework–an issue then pending before the Federal Circuit in *Caquelin*; specifically, the applicable takings liability analysis where a NITU expires without a trail-use agreement and, relatedly, whether the temporary taking continues beyond the NITU expiration.  *See* ECF 93.  Having filed an amicus brief

---

[33] The 25% reduction (rather than a 32% reduction) takes into account the fact that seven of the eight unsuccessful claims were dismissed by July 28, 2017, and the parties stipulated to the dismissal of the eighth claim about a year later, on June 25, 2018.

[34] To the extent multiple grounds of reduction apply to the same period, the reductions apply cumulatively.  For instance, for hours billed as of October 26, 2016, this additional 25% reduction applies to the already adjusted hours based on non-compensable client solicitation activities.

[35] These calculations exclude time counsel attribute to multiple (or no) ECF entries.

supporting the landowners' position in the first *Caquelin* appeal in January 2017, plaintiffs' counsel were fully aware of the potential impact of the pending decision.[36] Nevertheless, before the federal regulatory process concluded in this case, plaintiffs repeatedly opposed a stay of proceedings in this matter pending the Federal Circuit's anticipated (ultimately realized) clarification in *Caquelin*. Meanwhile, over the government's objections (e.g., necessity, relevance), plaintiffs pressed for discovery and to litigate state law abandonment issues.  Less than two months after briefing on the state law abandonment commenced at plaintiffs' request, NKCR consummated its abandonment on September 3, 2019; plaintiffs subsequently agreed that there was "no need for the Court to consider the issue of state-law abandonment in the context of the government's liability."  ECF 138. *Compare* ECF 112 *with* ECF 125 *and* ECF 138.

Following the Federal Circuit's May 29, 2020 decision in *Caquelin II*, the parties engaged in settlement discussions without further litigation and little judicial intervention.  By December 17, 2020, the parties amicably resolved all issues of liability and damages save attorney's fees and expenses.  *See* ECF 162. The Court concludes that plaintiffs' objections to the government's motion to stay proceedings in this case pending the Federal Circuit's decision in *Caquelin II*– instead compelling third-party discovery, discussed *supra*, and litigating issues ultimately immaterial to the resolution of this case–were unreasonable and wasteful.  The URA entitles counsel to reimbursement of *reasonable* hours expended, not *every* hour counsel elects to spend without regard to the import to or ultimate impact on the case.  Mindful of potential overlapping reductions attributable to the effort pursuing unsuccessful claims, the Court nevertheless imposes a further 40% reduction on hours expended from the inception of this case until February 24, 2020, to account for plaintiffs' overly litigious approach to this case and the series of unnecessary filings.[37]

### 3.    Excessive, Redundant, and Unnecessary Hours

"Counsel for the prevailing party should make a good faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from

---

[36] *See Caquelin v. United States*, No. 16-1663 (Fed. Cir.) (ECF 65 filed Jan. 19, 2017) (amicus brief filed by Largent, Hearne, Brinton, and Davis).  The four attorneys also filed two amicus briefs in the second *Caquelin* appeal.  *See Caquelin v. United States*, No. 19-1385 (Fed. Cir.) (ECF 93–94 filed July 29, 2019) (amicus briefs filed by Largent and Brinton and by Hearne and Davis, respectively).

[37] Counsel began attributing billed hours toward their March 12, 2017 motion for partial summary judgment on liability (ECF 37) on November 4, 2015–eight days after filing the original complaint with just one plaintiff and 16 months before the brief was actually filed.  As noted *supra*, that motion departed from the Court's case management order and was summarily denied as premature.  The end date of February 24, 2020 coincides with plaintiffs' formal abandonment of their collateral litigation of *Caquelin* and state law abandonment issues.

his fee submission." *Hensley*, 461 U.S. at 434.  Reimbursable hours under the URA must similarly exclude such hours.  Based on itemized adjustments, the government proposes a reduction of 671.9 hours to account for excessive, redundant, wasteful, or otherwise unnecessary hours.  For the reasons that follow, the Court agrees that a significant reduction is warranted.

Plaintiffs request reimbursement for 1,834.4 hours billed by a timekeeping ensemble of 34 different legal professionals comprised of: 4 Partners, 3 Of Counsels, 3 Associates, and 14 professional support staff at ArentFox[38] and, beginning in January 2019, 2 Members,[39] 4 Associates,[40] and 6 paralegals at Lewis Rice.  At times, over a dozen timekeepers simultaneously billed to this matter, including entries attributed to internal communications or the performance of nearly identical tasks.  For the original complaint–which included one plaintiff and recycles various passages from complaints filed by counsel in other rails-to-trails cases[41]–the billing team included at least 2 Partners, 2 Of Counsels, and 3 Paralegals.  By the time plaintiffs filed their fifth (and final) amended complaint in this case on July 20, 2017 (reorganizing party and parcel information), *see* ECF 62, counsel billed a total of 1,025.8 hours to this matter.  Of that time, roughly 500 hours are attributed to the preparation and filing of the original and five amended complaints.  At that point, except for briefing plaintiffs' motion for partial summary judgment on liability (again, summarily denied as contrary to the Court's directive and premature), the parties had not engaged in substantive briefing.

Review of the docket in this case side-by-side with ArentFox's and Lewis Rice's billing records reveals that counsel heavily staffed this matter and now seek reimbursement for every hour purportedly expended by every member of the litigation team.  In filing a 4-page *joint* status report with the government on February 24, 2020, for example, counsel at ArentFox and Lewis Rice billed at least 13.7 hours preparing and conferring.[42]  For a 30-minute status conference conducted by the Court on March 31, 2022, counsel recorded roughly 10 hours

---

[38] ArentFox's billing records included entries by 13 support professionals; counsel additionally included another support staff member, Karen E. Reyes, in their summary of the requested rates. *See* ECF 196 at 19; *see generally* ECF 196-1, 196-2.

[39] The two Members are Lindsay S.C. Brinton and Ms. Largent, two primary timekeepers in this case during their time at ArentFox before they moved their practice to Lewis Rice.

[40] One of the four Associates was promoted to Member in February 2022.

[41] *Compare, e.g.*, ECF 1 *with Brooks v. United States*, No. 15-843 (Fed. Cl.) (ECF 1 filed Aug. 7, 2015).

[42] *Compare* ECF 138 *with* ECF 196-2 at 3 *and* ECF 196-5 at 11–12.

preparing for and participating in the telephonic conference.[43]

Moreover, for the same NITU and railroad segment at issue in this case, multiple law firms targeted the potentially affected landowners, leading to at least four related cases with substantively identical claims.  Plaintiffs objected to the consolidation of the related cases.  During the course of litigation, however, counsel expended–and are now seeking reimbursement for–a significant number of hours communicating and corresponding with counsel in the related cases and reviewing filings and other documents prepared by other counsel.  For the now-consolidated *Arnold* case, *see supra* note 1*,* for example, counsel now seek over 120 hours in entries dedicated to, in whole or in part, communicating with counsel of record in that case.  Many of these billing entries are not associated with any ECF entry, are block-billed, or are generically categorized as "correspondence" or "call" with little indication as to whether or how the particular communication contributed to this case or the successful resolution of a particular claim.  While the Court recognizes such communications may involve cooperation necessary to advance plaintiffs' claims, the billing records lack sufficient detail enabling effective review, reflect little efficiency or contemplation by counsel in including them in their URA application, and cannot serve as a basis to award attorney's fees under the fee-shifting statute.

Next, despite plaintiffs' counsel's participation in *Caquelin I & II*, noted *supra*, counsel billed over 20 hours–*after* filing an amicus brief in that case–to review and research that case.  For most of these entries, moreover, counsel did not identify any relevant ECF entry in this case.  Along these lines, Mr. Hearne–an attorney touting over 30 years of experience representing over 1,000 landowners in cases under the Trails Act[44]–billed 76.5 hours (out of 158.9 total hours) in this case as follows: 5 hours "[r]eview[ing] law and conveyances re: government's liability for a compensable taking" the day the original complaint (with one plaintiff) was filed; 7.5 hours reviewing a draft amended complaint (Feb. 1–2, 2017); 3.6 hours on two identical entries for researching "government's temporary taking argument and issues re: trail use agreement . . ." (Mar. 20 & 30, 2017) with no associated ECF entry identified; 11 hours on two identical entries[45] for researching "*Arkansas Game and Fish* ruling . . ." (July 1–2, 2017); and 49.4 hours attributed to plaintiffs' revised motion for partial summary judgment (ECF 65 filed on July 21, 2017) which, as

---

[43] *Compare Arnold*, No. 15-1252, ECF 169–70 *with* ECF 196-2 at 9 *and* ECF 196-5 at 27.

[44] *See* https://truenorthlawgroup.com/thor-hearne/ (last visited Oct. 24, 2022); *Bratcher v. United States*, No. 15-986 (Fed. Cl.) (ECF 86-3 at 2 filed Sept. 1, 2017) (Hearne Decl. attached to plaintiffs' URA attorney's fee request).

[45] The billing records presented to the Court contain numerous instances of billing entries bearing identical or near-identical narratives.  *See, e.g.*, ECF 196-1 at 49 (Largent entries of 1.6, 1.0, and 2.0 hours on January 24, 25, 26, 2018, respectively, with identical narrative passage with the same typographical errors and no associated ECF entry).

noted *supra*, recycled pages of identical content from plaintiffs' previous motion (ECF 37 & 41). Although the researched issues were relevant to this case, given counsel's claimed expertise in rails-to-trails cases and similar hours requested in multiple cases counsel simultaneously litigated before this Court, the Court finds the requested hours excessive. *See, e.g.*, *Bratcher*, 136 Fed. Cl. at 797 (reducing excessive hours given counsel's extensive experience and intimate familiarity with issues researched).

Numerous other instances of excessive, redundant, or unnecessary entries further demonstrate a lack of reasonable billing judgment counsel are expected and ethically obligated to exercise. When Ms. Largent moved her practice to Lewis Rice, for example, Mr. Pafford of ArentFox billed 9.1 hours for what appears to be team transition work (with no associated ECF entry)[46] but was never thereafter involved in this case.[47] Plaintiffs' counsel also claim over 90 hours for travel–mostly to, from, or within Kansas and Nebraska–to meet with landowners for business solicitation. *See generally* 196-1 at 2–23. The billing entries do not indicate any travel necessary to conduct or participate in in-person witness interviews or depositions. In fact, there was no trial or evidentiary hearing, nor were there any depositions conducted in this case requiring such travel and, in fact, all status conferences with the Court were conducted telephonically. Plus, as noted *supra*, the Nebraska plaintiffs voluntarily dismissed their claims.

Further highlighting the unnecessary hours expended and sought to be reimbursed by ArentFox, counsel included in their URA application 10-plus hours expended on an attorney's lien filed (and withdrawn) in this case, seeking to preserve the firm's alleged claim to damages and attorney's fees and expenses ultimately recovered by plaintiffs.[48] The attorney's lien was voluntarily withdrawn by counsel following the Court raising *sua sponte* whether the filing was improvidently filed.[49] Similarly, counsel claims 18.9 hours ($13,540 in attorney's

---

[46] These include a block-billed 8.1 hours on "[r]eview[ing] file materials and outlin[ing] strategy re: valuation and settlement framework; discussion with T. Hearne re: crossing rights issue and severance damages; research re: same" and 1 hour for "[w]ork on transition issues and research re: joint representation in class actions; conversation with Federal Circuit clerk's office; multiple calls and email exchanges with M. Shambro." ECF 196-2 at 2. It was unclear, however, how the generally narrated items relate to issues litigated in this case: this matter did not involve a class action, nor was this case ever before the Federal Circuit.

[47] As documented in the ArentFox billing records, and consistent with the identified counsel of record in this case, Mr. Hulme assumed the role of lead counsel for the two plaintiffs remaining with ArentFox after Ms. Largent moved her practice to Lewis Rice.

[48] *Compare* ECF 183 *and* ECF 191 *and* *Arnold* ECF 174 *with* ECF 196-2 at 7–8, 9 *and* ECF 196-5 at 25, 27.

[49] During a March 31, 2022 status conference, the Court inquired whether the attorney's lien violated the Anti-Assignment Act, 31 U.S.C. § 3727, and was contrary to the law of this Circuit.

fees) attributed to Ms. Albin-Riley's "[w]ork on expert issues," "mapping issues," and reviewing documents filed in this case. No expert discovery took place in this case.[50] To the extent the referenced "expert" or "mapping" matters relate to approving engagements for land mappers and appraisers, the Court finds the requested time excessive and unnecessary.[51] *See Bratcher*, 136 Fed. Cl. at 794–95 (finding Albin-Riley's claimed hours excessive particularly when "the individual doing the work is a senior partner who performs these duties in connection with all of the firm's rails-to-trails cases.").

Additionally, as noted *supra*, as of December 17, 2020, the parties reached a tentative settlement on the just compensation due plaintiffs. Since then, counsel reportedly expended over 200 hours (ArentFox: 63.2 hours; Lewis Rice: 140.5 hours) primarily documenting, negotiating, and litigating issues surrounding their claimed URA attorney's fees and expenses. Billing entries related to the recovery of URA attorney's fees also date back to the early days of this litigation. Indeed, counsel started billing time on general research regarding URA fees and monitoring caselaw development since November 16, 2015–three weeks after they filed the original complaint.[52] Nevertheless, plaintiffs' attorney's fee application reiterates similar arguments advanced by the same counsel in related and other rails-to-trails cases already rejected by this Court and repeats the same billing errors previously noted by the Court. *See, e.g.*, *Bratcher*, 136 Fed. Cl. at 792–97 (reducing request for fees on various grounds); *Whispell Foreign Cars*, 139 Fed. Cl. at 392–402 (same). On this record, the Court finds the claimed hours purportedly expended on researching and litigating URA attorney's fees claims unreasonable and excessive.

---

*See Knight v. United States*, 982 F.2d 1573, 1577–78 (Fed. Cir. 1993); *Tucker v. United States*, 7 Cl. Ct. 374, 375–77 (1985). *See Arnold*, No. 15-1252, ECF 170. The Court further questioned the need for the attorney's lien given that ArentFox continued to represent two plaintiffs in the case.

[50] Notably, the billing records submitted for reimbursement reflect various entries billed by Ms. Largent on similar "expert" matters. *See, e.g.*, 196-1 at 28 (entry on January 15, 2017: 2.4 hours for work including "[m]eetings with potential appraisal experts and other valuation experts"); *id.* at 29 (entry on January 26, 2017: 2.1 hours for work including "[m]eeting with potential appraisal experts"); *id.* at 42 (entry on July 25, 2017: 2.0 hours for "[m]eet with potential appraisal experts at Appraisal conference at Wichita State University").

[51] In a previous case litigated by the same counsel, Ms. Albin-Riley claimed to be "responsible for retaining and managing experts in all Trails Act cases handled by [ArentFox]"; in defending similar billing entries (i.e., 11.4 hours), she stated those entries "involved the approval of engagements for the landowners' appraisers and mapping expert, and that it was necessary for her to review the pleadings to ascertain the exact scope of the experts' involvement in the case." *Bratcher*, 136 Fed. Cl. at 794–95 (citing Albin-Riley Decl. ¶ 3).

[52] *See, e.g.*, ECF 196-1 (various entries in early stages of this case for "Work on matters re: recovery of fees," "Review new case law from Federal Circuit re: URA fee reimbursement," "Review new filing in relevant Federal Circuit case re: URA reimbursement," "Research on new case law re: interest

Counsel's requested hours include excessive, redundant, and unnecessary effort that, throughout this litigation, drove up litigation costs without meaningfully contributing to the successful resolution of the dispute in their clients' favor.  Such effort, if rewarded, serves only to enlarge "the financial lot of attorneys" and departs from the spirit and intended purpose of the URA's fee-shifting provision.  *See, e.g.*, *Delaware Valley I*, 478 U.S. at 565 ("[fee-shifting] statutes were not designed as a form of economic relief to improve the financial lot of attorneys").  Accordingly, the Court imposes an overall 50% reduction on the aggregate hours adjusted on the grounds addressed *supra*.

### 4.   Administrative Tasks

Hours expended on administrative, secretarial, and clerical tasks–regardless of whether these assignments are billed by attorneys or professional support staff– are generally not recoverable under the URA fee-shifting statute.  *See Whispell Foreign Cars*, 139 Fed. Cl. at 395 (citing *Hopi Tribe v. United States*, 55 Fed. Cl. 81, 100 (2002)).  These non-compensable tasks include assembling documents, calendaring, filing, mailing, photocopying, proofreading, reviewing and managing client data.  *See Bratcher*, 136 Fed. Cl. at 796 (collecting cases).

In this case, 20 legal supporting professionals billed 668.4 total hours (36%) included in plaintiffs' URA attorney's fee application.  While the Court recognizes the necessity and critical contributions of support staff, work secretarial in nature is customarily and more appropriately accounted for as law firm overhead, and not billable to a particular client; and by extension, not properly recoverable under a fee-shifting statute.  Review of ArentFox's and Lewis Rice's tendered billing records reveals myriad claimed hours by support staff bearing generic descriptions like "analyze," "review," "manage," or "update" files.[53]  When the case was handled exclusively by ArentFox, for example, paralegal Epperson billed roughly 50 hours

---

rate to apply in just compensation payments," "Review billing records . . . to determine reasonableness for future settlement of URA or fee application per same").

[53] *See, e.g.*, ECF 196-1 at 10 (May entry on March 31, 2016: 7.5 hours for "Analyze and manage conveyances received from Norton and Decatur Counties and correspond with client regarding contact information"); *id.* at 11 (May entry on April 8, 2016: 5.8 hours for "Analyze East and West maps from experts for all four counties regarding proper coding and research landowners missing from our list"); *id.* at 19 (Barney entry on August 4, 2016: 3.3 hours for "Review and manage database, and plaintiffs' files. Review previously filed complaint. Review client correspondence regarding dismissal in preparation for second amended complaint . . ."); *id.* at 26 (Levin entry on December 21, 2016: 1.9 hours for "Recreated Dawson STB binder, correctly saving all documents and producing an entirely new binder"); *id.* at 51 (Epperson entry on May 30, 2018: 2.1 hour for "Research, review and analyze client data; telephone conference with client."); ECF 196-5 at 18 (Roland entry on December 14, 2020: 1.5 hours for "Review documents; update client files []; update client information []"); *id.* at 20–21 (Roland entries in February–March 2021: 3.3 hours for updating case files and "payee" information).

designated as reviewing or managing unspecified "client data" or "case data." *See generally* 196-1.  Out of the 353.8 hours billed by paralegal May, in turn, a significant number of entries were dedicated to "scouting locations" or other meeting arrangement activities, business solicitation or advertisement, maintaining case files or retrieving property-related documentation, monitoring deadlines, and requesting or forwarding documents.  *See generally id.*

Attorney timekeepers on this case similarly billed time dedicated to administrative work or work customarily performed by a supporting or more junior professional.  For a three-sentence counsel substitution form (ECF 115), Mr. Hulme–a partner with over 40 years of experience claiming a significant hourly rate–billed 1.1 hours and another attorney billed an additional 0.1 hours.  Other exemplary billings of Mr. Hulme include: 0.8 hours (June 9 and 23, 2020) reviewing two one-page orders on status conference scheduling; 1.1 hours (September 14, 2020) to prepare a list of four attorneys attending the status conference (ECF 154) (another attorney billed an additional 0.3 hours for the same list); and 0.8 hours (September 21, 2020) "[r]eview[ing] docket notices and schedule."  Ms. Largent, in turn, billed 2.5 hours for work including "[s]et up meetings" on March 18, 2016, and additional time for "calendar[ing]" various deadlines, reviewing engagement letters or bills, reviewing unspecified "correspondence" and client and landowner information, and managing team coordination.[54]

Such billing practices depart from the billing judgment reasonably expected and the ethical obligation attorneys must exercise in dealing with a private fee-paying client.  Reimbursement under the URA requires no less and does not operate as a vehicle for counsel to recoup time spent on administrative tasks that is better incorporated into overhead and operational expenses and not appropriately billed to a client.  Based on the billing records presented, and mindful of potential overlapping reductions, the Court finds a 10% downward adjustment to the aggregate hours counsel requested is warranted.

## 5.   *Vague Entries*

Adjustments to requested hours are justified where time entries lack sufficient detail to permit an effective review of their reasonableness.  *See, e.g.*, *McCarty v. United States*, 142 Fed. Cl. 616, 628 (2019) ("Billing entries must

---

[54] *See, e.g.*, 196-1 at 10 (entry on April 1, 2016: 0.3 hours for "Review C. May memo re: client conversation. Draft and send response to same"); *id.* at 18 (entry on July 13, 2016: 0.3 hours for "Memo to C. May to provide case status memo to A. Barney for taking over case responsibilities and outstanding discovery tasks"); *id.* at 47 (multiple entries for "Final review of correspondence to clients"); *id.* at 52 (entry on June 26, 2018: 0.6 hours for "Review revised status conference order. Re-calendar same. Review expert bills. Memo re: same. Review and revise case status update memo to T. Hearne."); *id.* at 56 (entry on September 4, 2018: 0.2 hours for "Review order scheduling status conference and calendar same").

contain sufficient detail to permit this Court to effectively review the claimed fees."); *Whispell Foreign Cars*, 139 Fed. Cl. at 395 (discussing court's discretion in adjusting requested hours based on vague entries).  Despite the Court's March 31, 2022 directive that counsel include "[s]pecific citations to ECF No(s). for the claimed hours and expenses[,]" *see Arnold*, No. 15-1252, ECF 170, the billing records submitted in support of plaintiffs' URA fee application are replete with entries bearing generic, vague descriptions as to the substance of work performed as well as block-billed entries for multiple (compensable, questionable, and non-compensable) tasks.  Accordingly, a further reduction is warranted.

Of the 1,834.4 total hours claimed by plaintiffs' counsel, over 240 hours (13%) are not associated with an ECF entry; many of these hours were billed for unspecified client correspondence, file management, unspecified communication (internally and with counsel in related cases), or general research.[55]  For entries where counsel identified relevant ECF entries, many nevertheless suffer similar deficiencies and include little detail enabling effective review of the claimed work.[56]  Based on the record presented, the Court finds an additional 10% reduction to the adjusted hours warranted to account for the vague or block-billed entries submitted, despite the Court's express directive, due to plaintiffs' failure to meet their burden to demonstrate reasonableness.

### 6. *Minimal Success*

"[T]he significance of the overall relief obtained by the plaintiff[s] in relation to the hours reasonably expended"–also denoted as "the degree of success obtained"–is "the most critical factor" in determining reasonable attorney's fees. *Hensley*, 461 U.S. at 435–36.  Nonetheless, courts may not mechanically reduce claimed billable hours or proffered rates solely on the basis of the degree of success

---

[55] *See, e.g.*, 196-1 at 17 (Largent entry on June 9, 2016: 1.0 hours for "Work on revising correspondence to landowners and landowners [sic] representatives"); *id.* at 19 (Barney entry on August 8, 2016: 1.4 hours "Research pleading documents"); *id.* at 44 (Payne entry on August 24, 2017: 3.7 hours for "Managed pleadings"); *id.* at 49 (Largent entry on February 22, 2018: 0.3 hours for "Call with D. Edwards"); *id.* at 57 (Epperson entry on September 26, 2018: 3.1 hours for "Work on declarations of landowners"); *id.* at 58 (Largent entry on October 5, 2018: 0.5 hours for "Review transcripts of oral argument and analysis of Supreme Court case re: inverse condemnation cases and possible changes in substantive law re: same"); ECF 196-5 at 27 (Roland entry on March 8, 2022: 1.6 hours for "Prepare correspondence re client update; update case files").

[56] *See, e.g.*, ECF 196-1 at 44 (Largent entry on August 28, 2017: 0.6 hours for "Call with D. Edwards. Review email from same. Memo to S. David re: research for reply. Confer with T. Hearne re. same"); *id.* at 52 (Payne entry on June 15, 2018: 1.5 hours for "Researched and retrieved pleadings and JSR from previous cases"); *id.* at 53 (Epperson entry on July 18, 2018: 2.5 hours for "Review joint status reports; review and analyze client data"); ECF 192-2 at 8 (Woodruff entry on November 1, 2021: 3.3 hours for "Searching through hard copy files for a document, per S. Kessler"); *id.* at 9 (Kessler entry on December 22, 2021: 1.4 hours for "Retrieve filed lien from docket; review and search through imanage [sic] spaces for fully executed engagement letter; emails re same").

counsel ultimately achieved. *See Bywaters I*, 670 F.3d at 1231 ("The mere fact that the recovery is small in amount is not a circumstance justifying a reduced fee award."). Where minimal recovery is obtained, reductions normally can be reflected in determining the reasonable hours expended rather than as an independent basis for adjusting the overall lodestar calculation. *See id.* "[A]djustments to the lodestar figure 'are proper only in certain "rare" and "exceptional" cases, supported by both "specific evidence" on the record and detailed findings by the lower courts.'" *Id.* at 1229 (quoting *Delaware Valley I*, 478 U.S. at 565); *accord Perdue*, 559 U.S. at 553. This is such a case.

Weeks before the STB issued the subject NITU, counsel began billing in this matter while soliciting business in the geographic areas near the subject railroad. As detailed *supra*, the contingent-fee arrangement executed with all 19 eventual plaintiffs committed the law firm to advance all costs and be compensated only on "successful" claims and based on either a percentage of total damages recovered or a URA application. Of the 19 putative owners of 25 tracts of land involved in this case, 13 plaintiffs (i.e., owners of 17 parcels) ultimately settled for an aggregate amount of $7,595.17 in just compensation. Recoveries for individual claims ranged from $6.59 to $2,109.45, of which: only 2 exceeded $1,000, 14 were for less than $500, 7 were for less than $100, and 4 were for less than $20. *See* ECF 192 at 2.

Plaintiffs' counsel now seek to recover nearly $800,000 in attorney's fees, plus expenses, based upon a claimed over 1,800 hours billed to this case over the course of 7 years after staffing the matter with 34 legal professionals. This case did not involve any novel legal issues; discovery was minimal; no depositions were conducted; court proceedings were limited to telephonic status conferences; and no evidentiary hearings or trials were held. Although the subject NITU and disputed lands were different, counsel–the same attorneys who have and continue to litigate similar rails-to-trails cases before this Court–recycled similar pleadings, motions, and briefs from other cases.[57] In the end, all title issues regarding the 17 successful claims were resolved through stipulation as opposed to litigation. Issues of liability and just compensation were, in turn, resolved by awaiting guidance from the Federal Circuit in *Caquelin II* and the parties' negotiations.

In arguing their entitlement to the requested attorney's fees despite the minimal just compensation awarded to the landowners, plaintiffs cite *Cloverport Sand & Gravel Co. Inc. v. United States*, 10 Cl. Ct. 121 (1986), *see* ECF 189 at 19, where this Court's predecessor awarded $9,190 in just compensation and $76,767.77

---

[57] During the pendency of this litigation, counsel litigated a number of other rails-to-trails cases in this Court. *See, e.g., Campbell v. United States*, No. 13-324 (Fed. Cl. filed May 8, 2013); *McCarty v. United States*, No. 14-316 (Fed. Cl. filed Apr. 18, 2014); *BHL Properties, LLC v. United States*, No. 15-179 (Fed. Cl. filed Feb. 26, 2015); *Kelley v. United States*, No. 15-924 (Fed. Cl. filed Aug. 24, 2015); *Bratcher v. United States*, No. 15-986 (Fed. Cl. filed Sept. 4, 2015); *Banks v. United States*, No. 16-1633 (Fed. Cl. filed Dec. 12, 2016).

in URA fees (i.e., $69,997.06 in attorney's fees and $6,700.71 in expenses). *Cloverport*, 10 Cl. Ct. at 127–28 ("In this Court's judgment, this case represents a clear example of the potential for *de minimis* liability awards in taking cases, accompanied by disproportionate and substantial awards of attorneys' fees."). As the United States Claims Court explained in awarding reasonable attorney's fees more than eight times the amount of the damages award, 95.5% percent of the attorney's fee awarded (i.e., $66,866.85) was for work performed during the trial phase of the case, including a 5-day trial on damages. *Id.* at 124–26.

Readily distinguishable from *Cloverport*, no trial took place in this case. More starkly, plaintiff's counsel in this case seek attorney's fees ($794,577.50) nearly 105 times the amount of total damages recovered by all of their clients combined ($7,595.17). The Court's canvass of fee-shifting cases finds no precedent with a similar damages award to attorney's fee award ratio particularly where, as here, the case was not complex, discovery was minimal, there was no trial, and title, liability, and damages issues were amicably resolved through negotiations– protracted in large measure due to plaintiffs' demands for excessive attorney's fees.

On the record presented, the Court finds an additional adjustment to the requested hours is warranted. As noted at the outset of this section, the Court believes this case falls into the "rare and exceptional cases" category meriting a downward adjustment to the lodestar figure. However, given the various reductions already taken into account, and mindful of potential "double counting" concerns, the Court imposes an additional 20% hours-adjustment rather than further adjusting the hourly rates awarded. *See, e.g., Blum*, 465 U.S. at 899–900 (adjustment to lodestar figure constituted double counting based on the same factors used to assess reasonable hours and proffered rates).

### Compensable Attorney's Fees

As captured in the table below, with the foregoing adjustments to the proffered rates and claimed hours, the Court awards plaintiffs' attorney's fees in the amount of $100,282.47 ($65,911.87 for ArentFox and $34,370.60 for Lewis Rice) as follows:

| Timekeeper | Requested Rate | Adjusted Rate | Requested Hours | Adjusted Hours | Adjusted Fees |
|---|---|---|---|---|---|
| **Partner** | | | | | |
| Albin-Riley, Debra | $670–$795/hour | $500/hour | 18.9 | 2.224908 | $1,112.45 |
| Hearne II, Mark F. | $555–$645/hour | $500/hour | 158.9 | 21.774744 | $10,887.37 |
| Hulme, James H. | $835–$955/hour | $500/hour | 78 | 22.36896 | $11,184.48 |
| Largent, Meghan S. | $415–$660/hour | $450/hour | 626.2 | 110.136024 | $49,561.21 |
| Brinton, Lindsay S. | $395–$660/hour | $450/hour | 89.9 | 11.214612 | $5,046.58 |
| Hart, Kirsten A. | $480/hour | $400/hour | 5.1 | 0.74358 | $297.43 |
| **Of Counsel** | | | | | |
| Pafford, Abram J. | $600–$670/hour | $350/hour | 59.8 | 9.1611 | $3,206.39 |
| **Associate** | | | | | |
| Davis, Stephen S. | $395–$480/hour | $300/hour | 49.4 | 7.26084 | $2,178.25 |
| Armstrong, Michael | $395–$495/hour | $300/hour | 21.9 | 6.82344 | $2,047.03 |
| LaMontagne, Laurel | $380–$485/hour | $275/hour | 18.7 | 6.01992 | $1,655.48 |
| Pankow, Morgan R. | $395–$515/hour | $275/hour | 12.6 | 3.58992 | $987.23 |
| White, Sarah L. | $250/hour | $250/hour | 11.5 | 2.2356 | $558.90 |
| Jefferson, Evan P. | $225/hour | $225/hour | 13.7 | 4.4388 | $998.73 |
| McWherter, Katherine G. | $215/hour | $215/hour | 1.4 | 0.27216 | $58.51 |
| **Other** | | | | | |
| Paralegal/Specialist | $115–$380/hour | $150/hour | 640.2 | 66.752424 | $10,012.86 |
| Project Assistant | $155–$185/hour | $100/hour | 28.2 | 4.89564 | $489.56 |
| | | | | **Total: $100,282.47** | |

## IV.   Expenses

Under the URA, in addition to reasonable attorney's fees, successful plaintiffs are entitled to the reimbursement of reasonable expenses incurred in the course of the litigation. *Bratcher*, 136 Fed. Cl. at 801. To recover litigation expenses, however, plaintiffs must demonstrate the costs incurred were "reasonable and necessary" in furtherance of the case and produce adequate proof to facilitate the Court's review. *Id.* (quoting *Oliveira v. United States*, 827 F.2d 735, 744 (Fed. Cir. 1987)).

Plaintiffs request $74,007.37 in litigation expenses. The claimed expenses suffer from the same defects as their attorney's fee application in that they include costs attributable to soliciting clients and business development, unnecessary travel, unsuccessful claims, and are replete with vague entries depriving the Court of a meaningful review. Additionally, the claimed expenses include items typically associated with overhead and other non-reimbursable costs; and they lack invoices and receipts documenting the scope of work performed and proof of actual payment. Plaintiffs' expense reimbursement request–seeking nearly 10 times the amount of recovered damages–stands in stark contrast to the minimal success achieved.

A significant portion of plaintiffs' claimed expenses ($51,163.25) is attributed to the purported cost of retaining Stantec Consulting Services, Inc. (Stantec) to map properties along designated areas of the NKCR railroad corridor. These services supposedly began in or about November 2015 and continued through in or about November 2018. *See* ECF 196-3. Presumably, plaintiffs' counsel received invoices documenting the actual scope of services performed as well as receipts for the amounts paid. Neither accompany plaintiffs' reimbursement application. Moreover, the accompanying "Narrative" in ArentFox's billing records shows that the claimed expense includes professional services performed in furtherance of *unsuccessful* claims, including mapping the properties of the five Nebraska plaintiffs who voluntarily dismissed their claims.[58] Accordingly, the Court must reduce plaintiffs' reimbursement request on this line item by at least 32% to reflect claims associated with the 8 of 25 tracts of land that received no recovery. Rather than disallow reimbursement entirely due to plaintiff's failure to properly document the alleged expense as it related to successful claims, the Court will further reduce the claimed reimbursement by an additional 25% to account for the uncertainty surrounding the expense likely incurred to some (unquantified and undocumented) relevant extent.

Plaintiffs' claimed travel expenses ($4,208.75), *see id.*, are unrecoverable for several reasons. First, at least initially, the claimed travel expenses are attributed to counsel's business development and client solicitation trips to *both* Kansas and Nebraska. Second, as addressed *supra*, no travel was necessary in litigating this case as no depositions were taken and all court proceedings (i.e., status conferences) were conducted by telephone. Plaintiffs have not met their burden to demonstrate otherwise. Finally, some of counsel's claimed travel expenses relate to travel to meet with potential experts, but there was no expert discovery in this case. Similarly, plaintiffs request reimbursement of meals ($331.98), lodging ($649.65), and conference room rentals ($170) related to counsel's client solicitation trips and meetings with experts. These claimed expenses, totaling $1,151.63, are also not recoverable.

Plaintiffs' request for expense reimbursement also includes $16,152.94 in alleged costs reportedly incurred for: Westlaw ($4,320.29) and Pacer ($150.80) research as well as unspecified copying ($6,324.85), printing ($3,543.35), and postage ($1,813.65). *See id.* The prevailing and customary industry practice is that law firms pay a flat fee or rate for research services like Westlaw, LexisNexis, and Pacer regardless of actual use. *See Bratcher*, 136 Fed. Cl. at 802 (citing cases). Plaintiffs do not contend, and nothing in the record indicates, that ArentFox is or

---

[58] The timing and descriptive language in the law firm's billing records suggest that the mapping performed extended beyond the eventual 25 tracts of land involved in this case. Indeed, the narrative generally refers to the "rail-trail corridor" in four Kansas and Nebraska counties during the time ArentFox was soliciting clients.

was charged for these research services per session or per search.  In fact, according to Mr. Hulme, "overhead and expenses necessary to provide the legal services to our clients" are factored into the hourly rates established for attorneys at ArentFox. *See* ECF 196-4 at ¶ 4.  In the absence of any representation or evidence to the contrary, the Court similarly finds that the claimed reimbursements for copying, printing, and postage fall within the ambit of unrecoverable overhead included in plaintiffs' claimed attorney hourly rates. *Otay Mesa Prop.*, 124 Fed. Cl. 141, 148 (2015) ("Generally, costs associated with administrative services 'are more appropriately charged to overhead' and should therefore be included within an attorney's hourly rate.").  Counsel's failure to attribute these generic expenses to a specific successful claim or litigative purpose underscores the Court's decision to deem them non-compensable.

Plaintiffs also seek reimbursement of the following costs in the aggregate amount of $964.80 reportedly incurred in the course of this litigation: court filing fees and fees to obtain copies of transcripts or deeds ($659.80); and fees for deed searches and retrievals ($305.00).  Although the claimed expenses similarly lack documentary proof in the form of invoices or receipts, and the deed research is not directly linked to specific (successful) claims, the Court finds these nominal expenses are reasonably related to the litigation of this case and, as such, they are compensable.

As captured in the table below, with the foregoing deductions, the Court awards plaintiffs reasonable litigation expenses in the amount of $27,424.06 (i.e., $27,164.26 for ArentFox and $259.80 for Lewis Rice):

| Deduction | Amount |
|---|---|
| Overhead/General Legal Services Expenses | ($16,152.94) |
| Unnecessary Travel | ($4,208.75) |
| Meals, Lodging, Conference Rentals for Client Solicitation | ($1,151.63) |
| Mapping Expenses—Unsuccessful Claims | ($16,372.24) |
| Mapping Expenses—Uncertainty re: Scope of Work | ($8,697.75) |
| Total Deductions | ($46,583.31) |
| **Total Adjusted Expenses** | **$27,424.06** |

## CONCLUSION

For the foregoing reasons, plaintiffs' motion for attorney's fees and expenses is GRANTED–IN–PART and DENIED–IN–PART.  Specifically, plaintiffs are awarded attorney's fees in the aggregate amount of $100,282.47. and litigation expenses in the total amount of $27,424.06.  Accordingly,

(1) The Clerk is directed to UNCONSOLIDATE *Dawson v. United States*, No. 15-1268 (Fed. Cl.), from *Arnold v. United States*, No. 15-1252 (Fed. Cl.).

(2) Plaintiffs' motion for attorney's fees and expenses (No. 15-1268L, ECF 196) is GRANTED–IN–PART and DENIED–IN–PART.  Plaintiffs are awarded attorney's fees in the aggregate amount of $100,282.47 and litigation expenses in the total amount of $27,424.06.

(3) Once unconsolidated, the Clerk is directed to enter JUDGMENT accordingly in *Dawson v. United States*, No. 15-1268 (Fed. Cl.).

It is so ORDERED.

Armando O. Bonilla