# In the United States Court of Federal Claims

## FOR PUBLICATION

No. 15-1252L
(Filed: May 22, 2023)

|  |  |  |
|---|---|---|
| **JOHN ARNOLD, _et al._,** | ) | |
| | ) | |
| _Plaintiffs,_ | ) | Rails-to-Trails Temporary Taking: |
| | ) | Attorney's Fees and Litigation |
| v. | ) | Expenses under 42 U.S.C. § 4654(c); |
| | ) | Fed. R. Evid. 408: Settlement Offers |
| **UNITED STATES,** | ) | |
| | ) | |
| _Defendant._ | ) | |
| | ) | |

_R. Deryl Edwards_, Law Office of R. Deryl Edwards, Joplin, MO, for plaintiffs.  With him on the briefs was _James F.B. Daniels_, McDowell, Rice, Smith & Buchanan, Kansas City, MO.

_Davené D. Walker_, Senior Attorney, Natural Resources Section, Environment and Natural Resources Division, U.S. Department of Justice, Washington, DC, for defendant.  With her on the briefs were _Todd Kim_, Assistant Attorney General, Environment and Natural Resources Division, and _David A. Harrington_, Assistant Chief, and _Hannah O'Keefe_, Trial Attorney, Natural Resources Section, Environment and Natural Resources Division, U.S. Department of Justice, Washington, DC.

## OPINION AND ORDER[1]

**_BONILLA, Judge_**.

This rails-to-trails Fifth Amendment takings action is one of four collaterally litigated cases involving an abandoned railroad line once extending through parts of

---

[1] This case was transferred to the undersigned for adjudication on February 28, 2022, pursuant to Rule 40.1(b) of the Rules of the United States Court of Federal Claims (RCFC).  Briefing on the issues resolved herein was completed on March 10, 2023.  Oral argument was deemed unnecessary.

Nebraska and Kansas.[2]  The one-year compensable temporary taking began on October 22, 2015, when the United States Surface Transportation Board (STB) issued a Notice of Interim Trail Use (NITU) under Section 1247(d) of the National Trails System Act, 16 U.S.C. §§ 1241–51, and ended on October 16, 2016, with the NITU's expiration.[3]  In accordance with RCFC 54(b), the parties stipulated to the entry of partial final judgment in favor of 14 owners of 17 parcels of land in the aggregate amount of $5,356.54 in just compensation, with each prevailing plaintiff recovering between $17.48 and $800.90, plus nominal interest.

Pending before the Court is plaintiffs' application for over $1 million in attorney's fees and litigation expenses under the Uniform Relocation Assistance and Real Property Acquisition Policies Act (URA), 42 U.S.C. § 4654(c).  As this Court found in the consolidated *Dawson* case: "The claimed attorney's fees and expenses exceed the bounds of any objective measure of reasonableness."  *See Arnold v. United States*, 163 Fed. Cl. 13, 18 (2022).  For the reasons detailed herein, plaintiffs are awarded $111,215.87 in attorney's fees and $11,012.45 in litigation expenses.  Accordingly, plaintiffs' application is GRANTED–IN–PART and DENIED–IN–PART.

## BACKGROUND[4]

Plaintiffs own property in Kansas along a 57.3-mile railroad segment previously operated by Nebraska, Kansas & Colorado Railway, LLC (NKCR).  In 2015, when NKCR announced its intent to abandon the rail line, Sunflower Rails-to-Trails Conservancy, Inc. (Sunflower) noticed its interest in converting the railroad segment to recreational trails.  The STB issued a NITU on October 22,

---

[2] Two companion cases, *Flying S. Land Co. v. United States*, No. 15-1253 (Fed. Cl.), and *David H. Field Trust, No. 1 v. United States*, No. 19-1202 (Fed. Cl.), were voluntarily dismissed through negotiated settlement.  The third companion case, *Dawson v. United States*, No. 15-1268 (Fed. Cl.), involved the eventual settlement of just compensation followed by the Court's adjudication of plaintiffs' request for attorney's fees and litigation expenses.

[3] As discussed *infra*, in litigating this case, plaintiffs asserted at one point that the taking continued until the railway company consummated the abandonment (i.e., September 3, 2019).  Because the parties resolved this issue in stipulating the just compensation due before the United States Court of Appeals for the Federal Circuit issued its decision in *Memmer v. United States*, 50 F.4th 136 (Fed. Cir. 2022), this Court did not address the disputed three-year delta.  *See id.* at 146 ("We agree with the government that the taking ended upon expiration of the NITU . . . . This is so because it was on that date that the United States was no longer responsible for mandating the continuation of the easement because, from that point forward, the decision rested solely in the hands of [the railroad company].").

[4] In addressing cross-motions for partial summary judgment in this case and, thereafter, the URA application filed in *Dawson*, the Court included detailed recitations of the factual background and legal proceedings.  *See Arnold v. United States*, 137 Fed. Cl. 524, 535–46 (2018); *Arnold*, 163 Fed. Cl. at 18–22.  A brief recap is provided herein, as necessary.

2015, authorizing NKCR and Sunflower to negotiate a trail-use agreement within 180 days, ultimately extended through October 16, 2016.  The NITU expired without agreement and NKCR consummated the abandonment on September 3, 2019.

Several months before the NITU was issued, plaintiffs' counsel, R. Deryl Edwards, began researching the potential railbanking of the 57.3-mile railroad segment and recorded ownership of the adjacent land.  Counsel subsequently contracted Elite Consulting, Inc. (Elite) to assist in these endeavors.[5]  After Sunflower expressed interest in sponsoring the rails-to-trails conversion, Mr. Edwards and several other law firms distributed letters and convened public meetings to inform local landowners of their property rights, vet potential claims, and solicit clients.  These efforts led to Mr. Edwards' ultimate representation of the 19 owners of 27 tracts of land who eventually joined this case.

In a September 10, 2015 Attorney Representation Agreement executed with the lead plaintiff in this case, Mr. Edwards agreed to represent landowners based on the anticipated issuance of a NITU.  In terms of hourly rates, the agreement states:

> I/We agree that our ATTORNEY has accepted representation of my/our interests based upon an hourly rate of compensation for his services and for the services of his consultants, paralegals, legal assistants and staff.  I/We agree that our ATTORNEY charges $450 per hour, his consultant charges $300 per hour, and paralegals, legal assistants and experts receive $150 per hour, and further agree that those rates are fair and reasonable. . . .

ECF 217-1 at 2.  The retainer agreement further provides: "CLIENT(S) will not be liable for any case fees, expenses or costs to the extent permitted by law or rule, but rather shall be solely submitted to the U.S. Government for payment under applicable law. . . ."  *Id.*

On October 26, 2015, four days after the STB issued the NITU, plaintiffs filed a 95-page complaint accompanied by over 300 pages of exhibits.  The amended complaint, filed on March 18, 2016, included two additional plaintiffs.  *See* ECF 15.  Through the ensuing claims book review, the parties partially resolved property ownership and title issues.  The parties thereafter disputed how the case should proceed: plaintiffs pressed to address comprehensive liability whereas the government focused on resolving outstanding title issues pending the conclusion of the STB regulatory process.

---

[5] In November 2016, Mr. Edwards involved co-counsel James F.B. Daniels.  *See* ECF 209-2 ¶ 10.

After several status conferences, on November 22, 2016, the Court ordered plaintiffs to file "partial motions for summary judgment *regarding title issues*, including fee or easement, intervening roads, and adjacency." ECF 27 (emphasis added). Notwithstanding the Court's directive, plaintiffs moved for summary judgment on the issue of liability. *See* ECF 33. In their 54-page motion, accompanied by 700 pages of exhibits, plaintiffs argued the alleged taking "continued through the end of the expiration of the extension - October 16, 2016." *See id.* at 47. Exhibit 1 comprised a 91-page proffer, largely repeating facts pled in the complaint. *Compare* ECF 33-1 *with* ECF 15. The government responded in kind to plaintiffs' legal arguments and factual contentions. *See* ECF 42–43. On July 7, 2017, the Court denied plaintiffs' motion "as premature" and ordered plaintiffs to refile their motion for partial summary judgment consistent with the Court's instructions. *See* ECF 45–46.[6, 7]

On September 18, 2017, following the STB's grant of a six-month extension for NKCR to consummate abandonment of the subject railroad segment, the Court ordered both parties "to submit a brief filing . . . explaining what impact, if any, the extension . . . has on the claims pending before the court." *See* ECF 62. In a lengthy submission, plaintiffs asserted "the impact is substantial and prejudicial"; and, departing from their prior litigation position, claimed the compensable taking continued beyond the NITU's October 16, 2016 expiration through at least the STB's current extension. Plaintiffs further argued the railroad company's continued failure to consummate abandonment would eventually convert the alleged taking to "permanent in nature." *Compare* ECF 64 at 33 *with* ECF 33 at 47. The government maintained that any potential taking ended upon the NITU's expiration. *See* ECF 65 at 4.

On November 17, 2017, the government partially withdrew its cross-motion for partial summary judgment. Through this withdrawal and along with the parties' previous agreement, the government stipulated that NKCR possessed only an easement for all but five of the outstanding parcels in dispute. *See* ECF 66 & 66-1. Defendant's partial withdrawal was based on the then-recent (October 27, 2017) decision of the Supreme Court of Kansas in *Jenkins v. Chicago Pac. Corp.*, 306 Kan.

---

[6] The Court further ordered plaintiffs' counsel to move for the dismissal of landowners who were "ripe for dismissal" and to explain the "proper conveyances" related to three additional parcels of land. *See* ECF 46 at 1–2. Joint owners of a parcel of land were voluntarily dismissed on July 12, 2017; owners of two additional parcels of land were voluntarily dismissed after additional briefing. *See* ECF 48; ECF 70.

[7] In ordering revised briefing, the Court directed: "Plaintiffs shall specifically identify any factual or legal variations, or changes in position on [title] issues only, between plaintiffs' earlier motions for summary judgment and the revised motions." ECF 46 at 1. On July 21, 2017, plaintiffs filed a 48-page revised motion, appending over 360 pages of recycled and additional exhibits. *See* ECF 56. The exhibits included an 87-page document with "proposed findings of fact," again compelling an in-kind response for defendant. *Compare* ECF 56-10 *with* ECF 60; *see also* ECF 59.

1305, 403 P.3d 1213 (2017), clarifying the governing state law regarding property interest conveyance to railroad companies. Based upon the parties' filings, on April 10, 2018, this Court granted plaintiffs' motion for partial summary judgment on title issues concerning 17 parcels of land, finding: plaintiffs owned the properties at the time of the NITU issuance, the land was adjacent to the railroad corridor, and NKCR possessed only an easement limited to railroad purposes. *See Arnold*, 137 Fed. Cl. at 583–85. Concomitantly, the Court granted defendant's cross-motion for partial summary judgment regarding two parcels of land and denied the parties' cross-motions concerning four other parcels. *See id.* at 582, 584–85. On July 6, 2018, upon further stipulation, plaintiffs voluntarily dismissed the four outstanding claims. *See* ECF 85.

In sum, by July 6, 2018, of the initial 27 claims asserted by 19 plaintiffs, 17 claims asserted by 14 plaintiffs remained as a result of voluntary dismissals and the Court's ruling. Nevertheless, over the course of the next year, the parties maintained "fundamental differences" regarding the applicable liability analysis framework and continued proceedings: plaintiffs urged additional briefing on liability and proposed an interlocutory appeal; defendant sought to await further guidance from the Federal Circuit in other pending cases and, instead, proposed proceeding to discovery. *See, e.g.,* ECF 84; ECF 95; ECF 99; ECF 101; ECF 105.

On July 25, 2019, plaintiffs filed a motion for partial summary judgment urging the Court to find that state law abandonment had occurred. *See* ECF 107. Mid-briefing, on September 3, 2019, NKCR consummated its abandonment, mooting the issue. Plaintiffs' reply brief, filed two days later, asserted that "state law abandonment is irrelevant and not necessary" to determine liability.[8] *See* ECF 109 at 2. When pressed on the inconsistent positions advanced regarding the end date of the temporary taking, plaintiffs doubled down on the later consummation date of September 3, 2019. *See* ECF 114. The parties continued to dispute the applicable liability analysis framework and, relatedly, whether the claimed taking ceased on October 16, 2016, when the NITU expired, or continued until NKCR consummated its abandonment three years later on September 3, 2019. *See, e.g.*, ECF 120; ECF 122. The Federal Circuit ultimately adopted the government's position in *Caquelin v. United States*, 959 F.3d 1360 (Fed. Cir. 2020) (*Caquelin II*). The parties then engaged in settlement discussions and requested a stay of proceedings. *See* ECF 136.

On December 17, 2020, the parties reported a tentative settlement on just compensation due the prevailing landowners but requested additional time to negotiate plaintiffs' claims for attorney's fees and expenses under the URA. *See* ECF 141. After reaching an impasse in their efforts to settle plaintiffs' URA fees, the parties stipulated to the entry of partial final judgment on landowner

---

[8] The Court ultimately dismissed plaintiffs' motion on state law abandonment as moot. ECF 201.

compensation.  Specifically, the 14 owners of 17 parcels of land totaling 82.34 acres would split the aggregate sum of $5,356.54 in just compensation, plus nominal interest.[9]  Drilling down, each claim was worth between $16.59 and $763.55, netting each plaintiff between $17.48 and $800.90.  *See* ECF 196.  The Court entered partial judgment consistent with the parties' stipulation on September 19, 2022.  ECF 200.

As in *Dawson*, with the stipulated entry of partial judgment addressing just compensation, the sole remaining matter is plaintiffs' application for attorney's fees and litigation expenses under the URA.  Pending before the Court is plaintiffs' request for $969,712.50 in attorney's fees and $75,584.17 in litigation expenses, broken down as follows:

| Claimed Attorney's Fees | | | |
|---|---|---|---|
| | Hours | Billing Rate | Total |
| Mr. Edwards | 2,015.8 | $450 per hour | $907,110.00 |
| Mr. Daniels | 147.3 | $425 per hour | $62,602.50 |
| | | Total | $969,712.50 |

| Claimed Litigation Expenses | | | |
|---|---|---|---|
| | Hours | Billing Rate | Total |
| Elite Consulting | 465.6 | $150 per hour | $69,840.00[10] |
| Other expenses | Mr. Edwards | | $5,623.37[11] |
| | Elite Consulting | | $120.80 |
| | | Total | $75,584.17 |

---

[9] The parties agreed to the accrual of interest at a rate of $0.26 per day, from August 1, 2022, through the date of payment.

[10] Plaintiffs' original URA application reflects a total of $70,980 for Elite, comprising billed service fees of $70,860 and copying expenses of $120.80.  *See* ECF 209-1 at 75–94.  A day after the government filed its response attaching itemized objections to plaintiffs' billing records, plaintiffs filed a Notice of Substitution appending an amended version of Elite's billing entries reflecting a reduced amount of $69,960.80, including 465.6 hours billed at $150 per hour plus copying expenses of $120.80.  *See* ECF 218 at 2; ECF 218-1.

[11] Plaintiffs' URA application lists $718.37 for "ordinary costs, disbursements and expenses." *See* ECF 208 at 43.  However, the accompanying billing records–including combined hourly billing and expense charges–reflect a total of $5,623.37 billed by Mr. Edwards for various food, travel, and copying charges.  *Compare id. with* ECF 209-1 at 2–64.  Defendant's response–which reorganized and segregated the expenses from the hourly service billing–totaled the claimed expenses to be $9,133.37.  *See* ECF 217-5.  Although plaintiffs raised no objections to the government's calculation, the Court notes the September 12, 2015 entry of $3,510 for 7.8 hours appears to be mistakenly included in the government's calculation of expenses and corrects that in the analysis herein.  *See id.* at 5.  Relatedly, as to the hourly billing, the government also mistakenly included Mr. Edwards' billing entry of 1 hour on October 29, 2021, as 0.1 hour, which the Court also corrects herein. *Compare* ECF 209-1 at 63 *with* ECF 217-3 at 73.

The government challenges the reasonableness of plaintiffs' request for attorney's fees and expenses on several grounds.  First, the government contends the URA limits recovery to attorney's fees and expenses "actually incurred" by *plaintiffs* which, based on the retention agreement, negates any award.  Alternatively, the government argues plaintiffs' fee calculations use excessive hourly rates and that plaintiffs improperly seek payment for hours attributed to client solicitation and other pre-complaint work, unsuccessful efforts, duplicative and excessive work, administrative tasks, and excessive "fees on fees."  Finally, the government avers plaintiffs' minimal success in this case warrants an additional reduction to plaintiffs' claimed attorney's fees.

In sum, under the government's alternative calculation–using the lodestar method–the maximum attorney's fees award should be $65,012.16.  *See* ECF 217 at 45.  However, the government argues this amount should be further reduced by at least 75% to account for plaintiffs' limited degree of success and the disparity between the landowners' compensation and counsel's fee request.  By the Court's calculation, the government aver that any attorney's fees award should be capped at $48,759.12.  As for the claimed expenses, defendant contends the requested reimbursement should be reduced because plaintiffs failed to substantiate their demands, and improperly request unnecessary expenses and expenses attributed to unsuccessful claims, limiting the recoverable amount to court fees totaling $463.35.

## DISCUSSION

## I.      Fee-Shifting Statute

The URA's fee-shifting provision provides that plaintiffs are entitled to an award of reasonable attorney's fees and expenses for services rendered in vindicating their takings or condemnation claims:

> The court rendering a judgment for the plaintiff in a proceeding brought under section 1346(a)(2) or 1491 of [T]itle 28, awarding compensation for the taking of property by a Federal agency, or the Attorney General effecting a settlement of any such proceeding, shall determine and award or allow to such plaintiff, as a part of such judgment or settlement, such sum as will in the opinion of the court or the Attorney General reimburse such plaintiff for his reasonable costs, disbursements, and expenses, including reasonable attorney . . . fees, actually incurred because of such proceeding.

42 U.S.C. § 4654(c).  The URA's fee-shifting provision ensures plaintiffs with small takings claims can attract and retain the assistance of competent counsel. *See Bywaters v. United States*, 684 F.3d 1295, 1295 (Fed. Cir. 2012).  As stated by the Federal Circuit: "litigation of these types of disputes serves a greater purpose

(vindicating constitutionally protected property rights)." *Id.* at 1296.  In determining awards of attorney's fees and recoverable expenses under fee-shifting statutes like the URA, a trial court has considerable discretion but "must 'provide a concise but clear explanation of its reasons for the fee award.'"  *Biery v. United States*, 818 F.3d 704, 710 (Fed. Cir. 2016) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983)).

Fee-shifting statutes like the URA, however, "were not designed as a form of economic relief to improve the financial lot of attorneys, nor were they intended to replicate exactly the fee an attorney could earn through a private fee arrangement with his client."  *Pennsylvania v. Del. Valley Citizens' Council for Clean Air*, 478 U.S. 546, 565 (1986) (*Delaware Valley I*), *as supplemented*, 483 U.S. 711 (1987); *accord Biery*, 818 F.3d at 710 ("Ultimately, a fee award must 'be adequate to attract competent counsel,' but must not 'produce windfalls to attorneys.'") (quoting *Hensley*, 461 U.S. at 444).  Indeed, jurisprudence surrounding the award of reasonable attorney's fees and expenses pursuant to the URA and other fee-shifting statutes prevents windfalls and avoids situations where counsel are overcompensated through excessive or unreasonable fee requests.  *See, e.g.*, *Davis Cnty. Solid Waste Mgmt. & Energy Recovery Special Serv. Dist. v. U.S. Env't Prot. Agency*, 169 F.3d 755, 758 (D.C. Cir. 1999) (*Davis County*) (recognizing exception to forum rate rule to "prevent the occasional erratic result where the successful [plaintiff] is vastly overcompensated given the amount he contracted to pay for legal services"), *cited with approval in Avera v. Sec'y of Health & Hum. Servs.*, 515 F.3d 1343, 1349 (Fed. Cir. 2008) (adopting *Davis County* exception).

## II.    No-Fee Retention Agreement

The retention agreement in this case assures each landowner that they bear no costs and pay no fee for counsel's representation.  Instead, according to the terms of the agreement, all attorney's fees and litigation expenses "shall be solely submitted to the U.S. Government for payment under any federal fees, costs and expense recovery statutes."  *See* ECF 217-1 at 2; *accord id.* ("[counsel] will seek reimbursement of all reasonable costs, expenses, attorney's fees, etc[.] . . . directly from the U.S. government . . .").  As in *Dawson*, the government argues the attorney's fees "actually incurred" as prescribed under the URA are limited to what *plaintiffs* actually committed to pay their counsel.  According to the government, because the retention agreement commits plaintiffs to pay *nothing* to their counsel, recovery under the URA is precluded.

The Court rejects the government's position.  The URA is the default mechanism by which successful rails-to-trails landowners may attract, retain, and pay competent counsel reasonable attorney's fees and reimburse litigation expenses to vindicate their Fifth Amendment rights.  As noted *supra*, however, the statutory scheme was not designed or intended by Congress to fund overzealous and litigious

8

counsel for every hour claimed to have been expended.  To conclude otherwise is to remove the term "reasonable" from the statutory language.  Thus, although not conclusive, the financial arrangement between an attorney and their client "may be taken into account in the lodestar calculation."  *Bywaters v. U.S.*, 670 F.3d 1221, 1231–32, 1232 n.7 (Fed. Cir. 2012) (*Bywaters I*).  Accordingly, the Court will consider the retention agreement, along with other relevant factors, in assessing reasonable fees recoverable in this case.

## III.   Lodestar Calculation

The Court now turns to the lodestar calculation to assess counsel's request for attorney's fees, "which is 'the product of reasonable hours times a reasonable rate.'"  *Haggart v. Woodley*, 809 F.3d 1336, 1355 (Fed. Cir. 2016) (quoting *City of Burlington v. Dague*, 505 U.S. 557, 559–60 (1992) (quoting *Delaware Valley I*, 478 U.S. at 565)).  "A fee award that is determined through the use of a lodestar calculation carries a 'strong presumption' that it represents a 'reasonable' attorney fee."  *Biery*, 818 F.3d at 710 (quoting *Bywaters I*, 670 F.3d at 1229); *accord Bywaters I*, 670 F.3d at 1228–29 ("In determining the amount of reasonable attorneys' fees under federal fee-shifting statutes, the Supreme Court has consistently upheld the lodestar calculation as the 'guiding light of [its] fee-shifting jurisprudence.'") (quoting *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 551 (2010)).

As explained by the United States Supreme Court in *Blum v. Stenson*:

> To inform and assist the court in the exercise of its discretion, the burden is on the fee applicant to produce satisfactory evidence–in addition to the attorney's own affidavits–that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation.

465 U.S. 886, 895 n.11 (1984).  Likewise, the burden rests on the fee applicant to properly document the hours expended, with sufficient specificity to enable meaningful review.  *See Hensley*, 461 U.S. at 437; *id.* at 441 (Burger, J., concurring) (The fee applicant must "provide detailed records of the time and services for which fees are sought" and establish "by clear and convincing evidence the time expended was necessary to achieve the results obtained.").

### A.   Hourly Rates

The Court first turns to hourly rates.  In assessing reasonable rates, courts generally look to the "prevailing market rate" of the forum court.  *Avera*, 515 F.3d at 1348 (citing cases).  Again, the URA applicant bears the burden of demonstrating that the hourly rates requested are both reasonable and comparable to similarly qualified attorneys providing similar services.  The so-called *Davis County* exception

to the forum court locale applies where, as here, "the bulk of the work is done outside of the District of Columbia in a legal market where the prevailing attorneys' rates are substantially lower." *See Avera*, 515 F.3d at 1349. The parties do not dispute the exception applies in this case.

Plaintiffs' application devotes less than two pages discussing counsel's claimed rates. Mr. Edwards requests an hourly rate of $450 for himself as the purported prevailing rate in Joplin, Missouri, where he performed the bulk of his work. Mr. Daniels claims an hourly rate of $425 for his work performed in Kansas City, Missouri.[12] In support of his proffered rate, Mr. Edwards cites a Missouri state court's judgment granting his interim application for attorney's fees against the estate of his late son, where Mr. Edwards served as trustee of his son's law practice, and his other son served as the representative of the estate.[13] Mr. Edwards further represents that he has settled other rails-to-trails cases with the government where he demanded similar rates.[14] In turn, Mr. Daniels cites an unrelated case where the Court awarded another attorney $595 per hour, proffering: "[Mr.] Daniels' qualifications and practice experience [listed in his declaration] are equivalent." *See* ECF 208 at 35.

Here, the Court is presented with a record where plaintiffs' counsel offer little more than self-serving statements in support of the reasonableness of their requested hourly rates. Such proffers are generally afforded little weight. *See, e.g.*, *Bradley v. United States*, 164 Fed. Cl. 236, 261 (2023) ("[Counsel's] statements,

---

[12] As noted *supra*, in memorializing the landowners' no-fee liability, the retention agreement includes the hourly rates counsel intend to seek from the government under the URA: $450 for Mr. Edwards, $300 for consultants, and $150 for support staff and experts. *See* ECF 217-1 at 2. The retention agreement in the record pre-dates Mr. Daniels' engagement in this case. The agreement further states the landowners agree that these hourly rates–that the landowners themselves are not obligated to pay–are "just, reasonable, and proper." *See id.* Counsel's self-proclaimed reasonable rates and their non-paying clients' purported acquiescence, while not entirely irrelevant, warrant little weight and do not dictate counsel's recovery from the government under the URA. To hold otherwise would effectively abrogate the mandated reasonableness assessment the Court must undertake.

[13] In support of his declaration in this case, Mr. Edwards includes a previously-executed declaration and billing entries related to the "Walmart litigation," where he asserted "each [billing] entry . . . is truthful, fair, and reasonable and was necessary to preserve the estate's and trust's interest . . . ." *See* ECF 209-2 at 31. The billing entries list hourly rates of $300 and $425 for two different cases. *Id.* at 32–39. The subject matter of the cited litigation and its purported import to the reasonableness assessment in this case remain unclear.

[14] The parties dispute the relevance of the purported agreed-upon rates in other cases resolved through settlement. As both parties recognize, reasonableness assessments under the URA necessarily present fact specific inquiries rooted in the particular circumstances of a given case. The parties' settlement of unrelated cases, while potentially relevant, is not determinative of this Court's independent assessment.

while unrebutted by defendant, are self-serving and conclusory, and therefore cannot be afforded great weight."). For its part, the government relies upon the declaration of Laura A. Malowane, Ph.D., an economist and attorney touting "extensive experience in analyzing and testifying on issues relating to the awarding of attorney['s] fees . . . ." *See* ECF 217-2 ¶¶ 1–2. The government posits that a reasonable attorney's fee award should use locally-based hourly rates of $245.70 to $304.20, rising between 2015 and 2022. For the reasons articulated in *Dawson*, the Court places limited weight on Dr. Malowane's opinions, noting her previous contradictory opinions in the rails-to-trails context while retained by plaintiffs' counsel. *See Arnold*, 163 Fed. Cl. at 28.

Plaintiffs further proffer that a locality adjustment to the highest partner rates awarded in *Dawson* (i.e., $500 per hour) would justify an hourly rate of $470 for Mr. Edwards. *See* ECF 222 at 25. In *Dawson*, after considering the record presented, persuasive caselaw from Missouri-based courts and this Court, and relevant billing rates surveys, this Court awarded hourly rates of $215–$500 to the St. Louis-based attorneys. Counsel's claimed rates of $425–$450 in this case fall toward the high end of that range. To arrive at the reasonable rates in this case, however, the Court considers several distinguishing factors. First, by referring to St. Louis as "[the] big city," *see* ECF 208 at 32–33, Mr. Edwards recognizes a locality difference between Joplin and St. Louis, meriting a downward adjustment from the St. Louis rates awarded in *Dawson*. Second, Messrs. Edwards and Daniels billed 72% of their claimed fees in the beginning stages of the case (i.e., 1,559 hours by end of 2017, including 421 hours by the March 18, 2016 filing of the amended complaint).

Third, while the litigation team in *Dawson* included over 25 junior attorneys (i.e., non-partners) and legal support professionals, Messrs. Edwards and Daniels are the sole attorneys and litigation team members in this case. Consequently, in *Dawson*, junior team members billed over 43% of the total billed hours (797.6 of 1,834.4 hours) at lower (non-partner) rates–rates ultimately awarded by the Court at between $100 and $300. By contrast, Messrs. Edwards and Daniels billed all 2,163.1 hours claimed in this case, 93% of them (i.e., 2,015.8 hours) at the claimed hourly rate of $450. Counsel's solo law practice may, as here, result in one or two senior attorneys undertaking all levels of work, regardless of complexity or required professional skills. That circumstance, however, cannot compel URA recovery of every claimed hour at partner rates. To that end, the Court is struck by the fact that Messrs. Edwards and Daniels–two attorneys touting their combined 90 years of legal experience–claim to have expended over 300 more hours than the 35 attorneys and legal professionals in the consolidated *Dawson* case (i.e., 2,263.1 hours versus 1,834.4 hours). Yet, in the end, the results achieved were comparably less: just compensation in the aggregate amounts of $5,356.54 and $7,595.17, respectively.

Fourth, although counsel claim extensive legal experience, their venture into the "complex and novel area of federal [railbanking] law," *see* ECF 209-2 ¶ 85, is relatively new.  According to his declaration, Mr. Edwards first "originated, investigated, and filed" railbanking cases in around 2014.  *See, e.g.*, *id.* at ¶¶ 27–29, 30 (listing previous cases).  Mr. Daniels became involved in rails-to-trails cases "[i]n early 2017."[15]  *See* ECF 209-3 ¶ 16.  If counsel devoted decades of practice to other areas of law, whatever hourly rates they charged for their seasoned specialties do not automatically apply to their new professional pursuit.  That is particularly true where, as here, in seemingly one of their first rails-to-trails cases, counsel demand partner rates for every hour expended, including hours devoted to tasks normally delegated to junior attorneys and support staff (*e.g.*, basic legal research, formatting and filing documents, collecting documentation).

In view of the above considerations, the Court finds that a downward adjustment to the partner rates requested by plaintiffs' counsel is warranted and awards reasonable hourly rates of $315 for Mr. Edwards and $265 for Mr. Daniels.  The Court now turns to the determination of compensable hours.

## B.   Compensable Hours

Counsel request reimbursement for a total of 2,163.1 hours: 2,015.8 claimed by Mr. Edwards and 147.3 hours claimed by Mr. Daniels.  Urging significant reductions, the government objects to the number of requested hours based on the following grounds: overbilling for pre-complaint work; unsuccessful claims and efforts; excessive and duplicative hours; wasteful and unnecessary efforts; administrative tasks; and excessive "fees on fees."  The government further contends plaintiffs' minimal success–demanding nearly 200 times the amount awarded in just compensation–and counsel's litigation approach, merit an additional downward adjustment of at least 75% to the calculated lodestar.  The Court addresses these issues seriatim.

### 1.   *Business and Client Development*

Based on counsel's billing records, Mr. Edwards began billing for this case on July 6, 2015, over three months *before* the STB issued the NITU and *prior to* the retention of any plaintiffs (prevailing or otherwise).[16]  When the initial complaint was filed on October 26, 2015 (i.e., four days after the NITU's issuance),

---

[15] Seemingly inconsistent with his declaration, Mr. Daniels' billing records include entries in this case dating back to November 2016.  *See* ECF 209-1 at 66.

[16] Counsel represent the first retention agreement was executed on August 15, 2015.  That document was not included in the record, and it remains unclear whether that retention agreement pertains to a plaintiff, let alone a prevailing plaintiff, in this case.

Mr. Edwards had already billed 367 hours.[17]  By March 18, 2016, when plaintiffs filed their amended complaint, Mr. Edwards had billed a total of 421 hours.  During this time, Mr. Edwards reportedly contracted Elite's services, accounting for an additional 339.1 hours claimed.[18]

In September 2015, after Sunflower expressed an interest in sponsoring the rails-to-trails conversion, Mr. Edwards "intensified" his efforts, convened public meetings, and continued to research and review geographical mapping, ancient deeds, and tax documents.[19]  ECF 209-2 ¶¶ 40–42; *see* ECF 209-1 at 6–9.  Billed a month before the NITU issued, most of counsel's billing entries are not linked to a landowner, let alone a landowner who subsequently joined and prevailed in this case.[20]  While this type of effort may be typical before initiating a rails-to-trails suit, such work is "more appropriately classified as client development [and] cannot be reimbursed."  *Bradley*, 164 Fed. Cl. at 263 (citing *Hensley*, 461 U.S. at 434).  Substantial reductions are therefore warranted to account for the non-compensable hours counsel expended on soliciting business and vetting claims.  Counsel's failure to properly document and delineate between compensable client representation and non-compensable business development further merits downward adjustment.

In assessing appropriate reductions, the Court recognizes that certain entries include compensable work dedicated to or contributing toward the representation of plaintiffs who ultimately prevailed (e.g., complaint drafting, NITU research).

---

[17] These hours represent counsel's efforts to, for example: monitor STB dockets; "research[] and investigat[e] the state of legal title to [the] 57.3 miles of former railroad corridor in order to determine the prospect of railbanking"; "secure[] . . . evidence of cognizable property interests"; convene "public meeting[s]" with landowners in adjacent counties along the railroad; and advise landowners on STB process development.  *See* ECF 209-2 ¶¶ 36–42.  The billing records during this time include numerous entries for locating and investigating potentially impacted land *in the event* a NITU was issued.  These include over 40 hours billed for traveling to Kansas for "onsite research" between August 9-13, 2015.  *See* ECF 209-1 at 4–5.  These exemplary hours were billed *before* counsel convened public meetings in local counties to recruit clients, *before* counsel retained any client, and *before* Sunflower's initial STB filing indicating its willingness to sponsor the rails-to-trails conversion.

[18] The parties dispute the nature and characterization of Elite's reported services and whether they are eligible for reimbursement under the URA as presented.  The Court addresses these issues in Sections IV(A) & (B)(2), *infra*.

[19] The billing records for September 2015 include: hours traveling to local counties; "research and drafting materials" for the public meetings; reviewing "ancient source docs" and "township maps"; "prep meeting room: exhibits, handouts, etc."; and associated travel, and corresponding with the landowners and unspecified "clients."  *See generally* ECF 209-1 at 6–9; *see, e.g.*, ECF 209-1 at 7 (8 hours billed on Sept. 9, 2015, for "Drive to Norton Co., Ks from Joplin, Mo"); id. at 8 (7.8 hours billed on Sept. 12, 2015, for "Travel from Norton Co., Ks to Joplin, Mo").

[20] The accompanying travel, printing, and food expenses, which counsel seek reimbursement as litigation expenses, addressed *infra*, suffer the same defects.

To account for these factors, the Court reduces counsel's requested hours by 85% through October 26, 2015 (i.e., the filing date of the initial complaint).[21]  Counsel's business and client development efforts likely continued thereafter, including through the filing of the amended complaint which added two plaintiffs.[22]  However, given that counsel's claimed hours between October 26, 2015, and March 18, 2016, reflect case-related work for retained clients, and taking into account the significant adjustment for pre-complaint non-compensable solicitation, the Court does not similarly reduce the hours claimed for this later period despite the entanglement of hours claimed for continuing business development.

### 2.    *Unsuccessful Claims and Efforts*

Hours expended on unsuccessful claims are not reimbursable.  *Hensley*, 461 U.S. at 435 ("no fee may be awarded for services on the unsuccessful claim[s]"); *Biery*, 818 F.3d at 712 ("There is no dispute that work done on behalf of the unsuccessful plaintiffs is not recoverable.").  Out of the initial 27 claims included in the amended complaint, plaintiffs ultimately prevailed through settlement on 17 claims.  By July 6, 2018, eight claims were voluntarily dismissed and the Court ruled in defendant's favor on two others.

Plaintiffs' counsel represent that they do not seek reimbursement for services performed for unsuccessful claims, proffering these services were performed at "no charge."  *See* ECF 208 at 33.  Counsel's billing records belie this representation. The Court identifies only 14 out of Mr. Edwards' almost 700 entries as containing "N/C" (no charge) tasks, mostly relating to the actual *filing* of plaintiffs' motions to voluntarily dismiss certain claims and notifying clients of the same.  The first of these entries is dated March 1, 2017; before then, counsel billed–and now seeks reimbursement for–a total of 951.2 hours.  Similarly, up through July 11, 2017 (i.e., the date of the second "N/C" entry identifying 0.4 hours for two items relating to the *filing* of another motion to dismiss), counsel billed and now seeks payment for an additional 227 hours.  The same applies to counsel's subsequent billing.  The total hours requested undoubtedly reflects time spent investigating and briefing all 27 claims included in the amended complaint, including the 17 that prevailed and, relevant here, the 10 that did not.[23]

---

[21] In the billing records presented, ECF 1 (i.e., the initial complaint filed on October 26, 2015) was ascribed, in whole or in part, to billing entries up through December 11, 2015.  *See* ECF 209-1 at 13.

[22] Counsel sought to add additional plaintiffs as late as June 2019.  *See* ECF 101 at 9 (request to add more landowners to this case).

[23] The billing entries similarly include time spent reviewing, researching, and corresponding about plaintiffs' motions to dismiss certain claims.  *See, e.g.*, ECF 209-1 at 38 (0.5 hours billed on July 13, 2017: reviewing defendant's three-page response to plaintiffs' voluntary dismissal without prejudice); *id.* at 39 (4.3 hours billed on July 15, 2017: 1 hour reviewing the same three-page document and

Mr. Daniels began billing to this case on November 17, 2016, when all 27 claims were involved, and continued throughout the case. His entries do not identify any "N/C" items. Presumably, Mr. Daniels' review, drafting, and teleconferencing hours involved *all* pending claims. His billing entries, however, fail to identify a particular landowner or client; the records also do not distinguish between work performed in furtherance of successful claims and pursuing claims voluntarily dismissed or otherwise unsuccessful.

The billing records presented in support of plaintiffs' URA application demonstrate little effort by counsel to carve out non-compensable hours expended on unsuccessful claims. As such, the Court finds a reduction warranted, particularly in view of counsel's failure to make reasonable efforts while proffering contradictory (and unsupported) representations. Accordingly, the Court imposes a 35% reduction of hours billed through July 6, 2018.[24]

On similar grounds, defendant objects to counsel's time expended on several unsuccessful filings, including plaintiffs' first round of summary judgment briefing which the Court summarily denied as premature. The Court's initial order was clear in directing plaintiffs to "file their partial motions for summary judgment regarding title issues . . . ." *See* ECF 27. As explained above, counsel instead briefed the overarching issue of liability, necessitating a new round of briefing consistent with the Court's initial directive. *See* ECF 46. For the first brief, counsel billed roughly 210 hours through March 13, 2017. By the time plaintiffs filed a revised brief on July 21, 2017, counsel billed another 200-plus hours, mostly devoted to preparing the revised filing and resolving the parties' disputes resulting from plaintiffs' initial brief.[25] Such unnecessary efforts fall outside of the realm of recovery allowable under the URA. The same holds true for the interim hours counsel expended on unsuccessfully defending their chosen litigation path departing from the Court's explicit order.

Counsel's unfruitful efforts extend further, to include the hours spent addressing the issue of state law abandonment. Early on, counsel expressed their

---

3.3 hours researching and Shepardizing cases on dismissal); *id.* at 45 (3.1 hours billed on Jan. 5, 2018: similar review and research); *id.* at 47 (1.3 hours billed on July 5, 2018: correspondence with defendant regarding dismissal).

[24] To the extent multiple grounds of reduction apply to the same period, the reductions apply cumulatively. The Court finds many entries in the billing records at issue suffer multiple defects warranting cumulative percentage reductions. The Court must take all applicable grounds into account in assessing the compensable portion.

[25] Including Elite's contemporaneous billing, the government calculates counsel billed 703.4 hours for their initial and revised summary judgment briefs, of which 390.5 hours were expended before the Court rejected the initial filing. Plaintiffs did not respond or object to the government's calculations.

understanding that, without abandonment through the STB regulatory process, abandonment under state law would not afford plaintiffs the relief requested. *See* ECF 26 at 8; *see also id.* at 5 (counsel intended to seek relief from the STB to compel abandonment); *see also* ECF 209-2 ¶¶ 48–49 (outlining counsel's effort to "aggressively participate" in STB proceeding compelling NKCR's abandonment); ECF 107-1 at 29 (plaintiffs' post-abandonment filing in STB proceeding).  Then, in 2019, over defendant's objection, counsel in this case joined attorneys in the companion cases and requested briefing on this issue.  *See* ECF 105.  Relatedly, despite not being a party to a then-pending third-party discovery dispute, counsel submitted a brief contending substantial impact, urging discovery, and advising the Court on various matters.  *See* ECF 101.[26]  Shortly after plaintiffs filed a 32-page memorandum, appending over 100 pages of exhibits, NKCR abandoned the subject rail line on September 3, 2019, mooting the issue.  Two days later, despite counsel's proposal to brief the issue, plaintiffs proclaimed: "state law abandonment is irrelevant and not necessary."[27]  *See* ECF 109 at 2.

These examples highlight counsel's sustained effort to brief and otherwise pursue issues bearing little impact on the ultimate resolution of this case. Counsel's request for fees under the URA, generously inclusive of all hours dedicated to such efforts, disregards the burden borne by the fee applicant to demonstrate reasonableness.  Despite the Court's considerable effort, counsel's billing records–rife with inaccurately ascribed ECF numbers and vague descriptions–coupled with counsel's failure to meaningfully respond to defendant's objections and calculations, render it nearly impossible to accurately delineate compensable hours from fruitless endeavors.

For the foregoing reasons, the Court imposes a 50% reduction on hours for the following periods: (1) November 17, 2016 (i.e., first billing entry associated with the Court's November 22, 2016 order on briefing title issues), through July 7, 2017 (i.e., Court order denying plaintiffs' initial motion for partial summary judgment);

---

[26] The Court's June 6, 2019 order scheduled a status conference to address the third-party discovery dispute in the related cases.  *See* ECF 100.  Counsel in this case expended over 40 hours researching and drafting an 11-page brief of "suggestions" ahead of the scheduled status conference, and another 2.9 hours communicating with counsel and attending the June 14, 2019 status conference.  As reflected in the post-status conference order, counsel's suggestions–including referral to the STB and to add additional plaintiffs–were largely denied.  *See* ECF 102; *see also* ECF 103.  Nevertheless, counsel seeks reimbursement for all hours expended on these efforts.

[27] Defendant contends plaintiffs' counsel billed 143.5 hours in 2019 on the issue of state law abandonment.  Plaintiffs did not respond or object to this calculation.  ECF 217 at 38.  By the Court's count, between June 6, 2019 (i.e., when the Court issued an order convening a status conference on third-party discovery leading to the state law abandonment briefing), and March 27, 2020 (plaintiffs' filing stating "no need for the Court to consider the issue of state law abandonment"), counsel billed 226.7 hours, the majority of which appears to be devoted to researching and briefing state law abandonment.

and (2) May 30, 2019 (i.e., first billing entry associated with the Court's June 6, 2019 order convening status conference leading to state law abandonment briefing), through May 29, 2020 (i.e., last billing entry associated with the parties' filings on March 27, 2020 agreeing state law abandonment is irrelevant).

### 3.    Excessive, Duplicative, and Unnecessary Hours

Recovery under the URA excludes excessive, duplicative, or otherwise unnecessary hours.  "Counsel for the prevailing party should make a good faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission." *Hensley*, 461 U.S. at 434 (noting "billing judgment" is important component in fee setting).  Based on itemized reductions of varying percentages to identified billing entries, defendant proposes reducing plaintiffs' URA application by 378.3 hours to account for excessive and duplicative entries, and 548.97 hours to account for wasteful and unnecessary efforts.  ECF 217 at 40, 42.  The Court agrees reductions are warranted as counsel's billing records are devoid of the requisite "good faith effort" and "billing judgment" to identify and appropriately exclude or adjust such hours.

As noted above, counsel's billing records include 367 hours billed by October 26, 2015, when the initial complaint was filed.  During this time, Elite billed an additional 318.4 hours.  Counsel represents the complaint was prepared and filed "in a RCFC 56(c) format, unlike the other cases."  ECF 26 at 5; *see, e.g.*, ECF 209-1 at 11 (exemplary billing entries stating complaint was drafted in "RCFC 56 SJ format" or "SJ format").  The 95-page complaint and accompanying 40 exhibits "set out ancient provisions of the Kansas Constitution, Kansas statutes and ancient records of judicial condemnations of rights-of-way, together with controlling Kansas decisions[.]"  ECF 209-2 ¶ 52; ECF 1.  The complaint attached "all the government records and records of cognizable property interest which [counsel] had assembled or was assembling[,]" including "ICC Valuation Sheets . . . ICC Valuation Maps . . . deeds, tax records, judgments of condemnation, tract maps, and plat maps[.]"  ECF 209-2 ¶¶ 42, 53.

In contrast, the complaints filed in the three companion cases ranged in length from six to fifteen pages.  The nature, relative complexity, and comparative outcomes of these cases undermine the claimed reasonableness of counsel's exhaustive pre-filing investment of time and resources.  This is particularly true where, as here, despite the touted thoroughness in preparing the "extensively researched and documented complaint" with "dispositive proofs" on title issues, *see id.* at ¶¶ 51, 52, counsel then expended hundreds of additional hours on filing the subsequent motion for partial summary judgment.  By the time plaintiffs responded to defendant's cross-motion for partial summary judgment on September 8, 2017, counsel billed 1,444.1 hours in this case.  In the end, nearly

all of the title issues were resolved through negotiation and stipulation.  On this record, and particularly given counsel's claimed subject matter expertise, the Court finds the hours expended on title issues excessive.[28]

Counsel's billing records therefore do not reflect the required level of reasonable billing judgment.  The case did not require additional briefing on the issue of liability and the parties settled on just compensation in the months following the Federal Circuit's decision in *Caquelin II*.  Yet, after the resolution of title issues, counsel billed another 500-plus hours, of which approximately 135 hours were attributed to efforts to resolve plaintiffs' URA application.[29] Counsel's excessive billing is further exhibited by their extraneous filings and over-briefing of issues.  *See, e.g.*, ECF 26; ECF 64; ECF 69–70; ECF 101.  Given the relative import of these efforts, the Court finds counsel's billing crosses the line from reasonable to excessive and unnecessary.  The billing records further include numerous entries billed for handling simple court filings, reviewing case documents, and corresponding with Elite and clients regarding unspecified work.[30]  And despite counsel's touted rail-to-trails experience and expertise, the billing records include numerous entries expending significant hours researching the Court's rules and basic legal issues.[31]  Each hour spent performing basic legal research is billed at a senior partner rate.

---

[28] Another example lies in the fact that counsel billed 18.5 hours reviewing the Court's April 10, 2018 opinion and another two hours drafting client letters regarding the same.

[29] An October 29, 2021 joint status report included the following update regarding the parties' efforts to amicably resolve plaintiffs' URA application: "Plaintiffs in this action have demanded URA reimbursement in an amount substantially larger (in both dollar and percentage terms) than the approved settlement in *Flying S. Land* and the rejected settlement in *Dawson*."  ECF 157 at 2 n.2.

[30] *See, e.g.*, ECF 209-1 at 6 (1.5 hours billed on Aug. 14, 2015: "review emails from Elite and draft emails"; "t/c with Elite"); *id.* at 14 (7.5 hours billed on Dec. 28-29, 2015: review defendant's answer to initial complaint); *id.* at 24 (0.3 hours billed on Sept. 19, 2016: review one-paragraph order rescheduling status conference; *id.* at 36 (0.6 hours billed on June 10, 2017: "t/c with Elite re client contacts and issues – CPI research"); *id.* at 34 (0.6 hours billed on Mar. 10, 2017: "Review Elite email re JacksonIT"; "t/c with Elite"); *id.* at 52 (0.5 hours billed on June 21, 2019: "review email from client"; "t/c" with client); *id.* at 53 (0.9 hours billed on July 12, 2019: "Review email from client Hillebrand" and "t/c with client"); *id.* at 56 (0.2 hours billed on Mar. 19, 2020: review order listing dial-in information for status conference); *id.* at 58 (2 hours billed on Sept. 15, 2020: "Research time line [sic] and cases as they [r]elate to Arnold case and scheduled hearing"); *id.* at 58 (1 hour billed on Sept. 21, 2020: "Telephone conference with plaintiff Cecelia Hillebrand re her earlier email received today").

[31] *See, e.g.,* ECF 209-1 at 9 (8 hours billed on Oct. 2, 2015: review and research "CFC jurisdiction," "5th amendment takings claims," "reviewing [unspecified] docs," "Ladd and shep"); *id.* at 12 (7.5 hours billed on Oct. 21, 2015: "research 28 USC 2501" and cases); *id.* at 37 (8.5 hours billed on June 19, 2017: research "RCFC 15" and cases); *id.* at 37 (8.4 hours billed on June 21, 2017: "Research RCFC 8(c)(1)" and cases); *id.* at 48 (8.2 hours billed on Aug. 28, 2018: research "28 USC 1292(d)(2)," "RCFC 54(b)," and cases); *id.* at 57 (6.9 hours billed on Jun. 22, 2020: review filings in "*Caquelin*"

As these examples illustrate, counsel's billing records lack indicia of reasonable billing judgment and deprive the Court the ability to delineate the appropriate number of compensable hours.  For these reasons, the Court imposes an overarching 30% reduction of hours to reflect counsel's failure to exercise reasonable billing judgment and otherwise compensate for the evidentiary shortcoming.

### 4.   Administrative Work, Vague Entries

Reimbursement under the URA generally excludes hours performing administrative, secretarial, and clerical tasks regardless of whether these assignments are performed by attorneys or professional support staff.  *See Whispell Foreign Cars, Inc. v. United States*, 139 Fed. Cl. 386, 395 (2018) (citing *Hopi Tribe v. United States*, 55 Fed. Cl. 81, 100 (2002)).  This is particularly true where, as here, Mr. Edwards (a solo practitioner) and Mr. Daniels (a partner in a small firm) performed numerous administrative tasks customarily performed by junior attorneys and legal support professionals.

Many billing entries mix non-compensable administrative work with compensable substantive work, leaving the Court to guess the extent of each category.  The Court identifies the following non-exhaustive exemplary filings for Mr. Edwards:

- For a one-sentence order reassigning this case to another judge, counsel billed 0.4 hours to review the order and "note change of judge in file and computer" (Jan. 12, 2016).

- In response to a one-page order to submit a transcription of a deeds document, counsel assigned 12 entries totaling 12.4 hours to review the order, calendar the deadline, transcribe the two-page document, and file the transcription (Dec. 7-22, 2017).[32]

- In response to a post-status conference order requesting statements to "confirm in writing the parties' positions on several issues discussed at the teleconference," *see* ECF 125, counsel expended 5.3 hours preparing and filing a two-page response (Mar. 25-27, 2020)–half of which concerns listings of dismissed parcels and the number of remaining plaintiffs, and another 3.7 hours reviewing and analyzing defendant's 5-page consolidated response to the same order (Mar. 27, 2020) on the four related cases.

---

and research); *id.* at 71 (14.7 hours billed on June 14-20, 2022: research URA fees in rails-to-trails cases).

[32] The billing entries included at least 5.1 hours devoted to transcribing the document and, without explanation, another 1.1 hours billed the day after the filing.

- To file a two-sentence report identifying himself as the individual attending a status conference, Mr. Edwards billed 0.4 hours (Sept. 14, 2020) and another 0.1 hours (Sept. 15, 2020) reviewing defendant's submission identifying Ms. Walker.

- When the Court stayed all related cases for settlement and requested counsel "file with the court a list of each plaintiff represented by such counsel, as well as the parcel(s) claimed by each plaintiff," *see* ECF 136, counsel assigned six entries totaling 4.5 hours to review the two-paragraph order and prepare and file a one-page list of plaintiffs (Sept. 18-25, 2020).

- After the parties reached settlement on just compensation in December 2020, Mr. Edwards billed at least 24 hours corresponding with landowners regarding the settlement.

As for Mr. Daniels, the Court identifies the following examples similar in nature: 0.9 hours preparing a two-page motion for an extension of time and reviewing the order granting the motion (Jan. 19 & 23, 2017); 1.4 hours revising and renumbering exhibits appended to plaintiffs' initial motion for partial summary judgment (Mar. 11, 2017); 0.7 hours reviewing a one-sentence order denying plaintiff's dispositive motion as premature (July 7, 2017); and, in connection with the URA fee application, 5.1 hours to "[a]ssemble and reformat billing records" (June 9, 2021).

Although certain entries include some compensable substantive work, the billable records submitted in support of plaintiffs' URA application make no discernable effort to identify and distinguish between hours properly attributable to substantive work performed by partners and non-compensable administrative tasks typically handled by junior attorneys and support staff. To compensate for counsel's improper inclusion of administrative work throughout the case and their failure to apply appropriate reductions, the Court imposes an across-the-board 30% reduction in hours.

5.     *Fees-on-Fees Hours*

After the parties resolved the issue of just compensation due the prevailing plaintiffs in December 2020, as noted above, counsel billed 135.5 hours primarily focused on efforts to resolve the issue of attorney's fees and litigation expenses due under the URA. Acknowledging the general allowability of recovering attorney's fees for hours expended resolving URA applications, defendant objects to the number of hours claimed, proposing a 50% reduction for 91.8 hours billed in 2022.

Although Mr. Edwards handled most of the work up to and through the parties' settlement negotiations, Mr. Daniels was tasked with formatting the billing records and drafting plaintiffs' fee application. Nearly three years since his last

entry in 2018, Mr. Daniels billed 5.1 hours on June 9, 2021, assembling and reformatting the billing records.[33]  Eleven months later, beginning on June 15, 2022, Mr. Daniels billed at least 90 hours researching and drafting the pending URA application.  Consistent with his representation that he became involved in rails-to-trails cases in early 2017 through Mr. Edwards (*see* ECF 209-3 ¶¶ 16–18), Mr. Daniels billed–at partner rates–over 14 hours conducting "initial" research on URA fees under 42 U.S.C. § 4654.[34]

Many of defendant's itemized objections are based on excessiveness or the clerical nature of the work, addressed *supra*.  To account for the potential overlap and avoid "double counting," while disallowing improper recovery, the Court applies an additional 10% downward adjustment to the hours billed from December 18, 2020, onward.

### 6.    *Minimal Success and Other Considerations*

In assessing the number of reasonable hours and reasonable attorney's fees recoverable under the URA, "the most critical factor is the degree of success obtained."  *Hensley*, 461 U.S. at 436.  Where plaintiffs achieve limited success, "the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount."  *Id.* at 436.  In cases with minimal recovery, appropriate reductions may be reflected in determining reasonable hours, rather than as an independent basis for adjusting the overall lodestar calculation.  *See Bywaters I*, 670 F.3d at 1229 (adjustments to the lodestar figure are proper only in "rare" and "exceptional" cases, "where the lodestar figure fails to take into account a relevant consideration") (quoting *Delaware Valley I*, 478 U.S. at 565); *accord Perdue*, 559 U.S. at 553.

The 14 prevailing landowners (out of the initial 19 plaintiffs) settled for an aggregate amount of $5,356.54 in just compensation, including interest.  Individual claimants recovered between $17.48 and $800.90.  All but three plaintiffs recovered less than $450–i.e., Mr. Edwards' requested hourly rate.  For achieving these results, counsel request $969,712.50 in attorney's fees and, as addressed *infra*, an additional $75,584.17 in litigation expenses.  The URA application seeks nearly 200 times plaintiffs' aggregate recovery.

---

[33] Of note, the billing records generally comprise Mr. Edwards' entries beginning July 2015, with over 770 hours billed before Mr. Daniels joined the case in November 2016.

[34] For his part, Mr. Edwards' hours during this period focused on reviewing Court orders and status reports drafted by the government and filing several notices and motions for extensions of time.  *See, e.g.*, ECF 209-1 at 63 (0.9 hours billed on Jan. 5, 2022: assembling list of plaintiffs); *id.* at 63 (1.3 hours billed in Feb. 2022: unopposed motion for an extension of time to revise and resubmit billing records; reviewing court orders); *id.* at 64 (0.6 hours billed on Sept. 16, 2022: unopposed motion for an extension of time to file the pending URA fee application).  These hours are likewise billed at senior partner rates.

Defendant urges an additional reduction of at least 75% to account for the disparity between the compensation recovered and the attorney's fees requested, citing counsel's overly litigious approach to this case and lack of billing discipline. The Court agrees that an additional reduction to the hours is warranted, particularly in view of the following factors which, although related to, were not fully reflected in, the afore discussed grounds.

Prior to and throughout this litigation, counsel represent they "aggressively participate[d]" in the STB proceedings and ultimately "forced" the NKCR to consummate abandonment in September 2019. *See, e.g.*, ECF 209-2 ¶¶ 48–49 (outlining counsel's active involvement in the STB proceedings). On January 4, 2022, the Court directed plaintiffs to revise their billing records, stressing that the time "billed for charges that related to the [STB] [is] not recoverable in the case[.]" *See* ECF 159. In the pending URA application, counsel represent that their revised submission does not seek reimbursement for counsel's efforts before the STB. ECF 209-2 ¶ 50. Counsel's billing records belie this representation.

The billing records filed in support of plaintiffs' pending URA application continue to include entries related to the STB proceedings.[35] Counsel further spent considerable time and effort updating the Court on the STB proceedings and counsel's engagement with the regulatory board.[36] Although these hours include work necessary for this case and, thus, compensable under the URA, the billing records render it most difficult, if not impossible, to discern the precise extent of such compensable work.

Review of counsel's extensive briefing on the STB proceedings, however, reveals a more troubling issue: plaintiffs' inconsistent positions as to the nature and duration of the claimed taking, which counsel expended numerous hours disputing. In the pending fee application, counsel state:

---

[35] *See, e.g.*, ECF 209-1 at 53 (0.4 hours billed on July 2, 2019: "t/c with STB"); *id.* (1 hour billed on July 11, 2019: "Telephone call John Arnold re STB and federal claims court action"); *id.* at 55 (0.3 hours billed on Sept. 3, 2019: "review STB Morell letter"); *id.* at 60–61 (a total of 5 hours billed on Feb. 11, 2021: communicating with client, including advising landowners "of [counsel]'s success before the STB requesting railroad consummate abandonment of easement").

[36] *See, e.g.*, ECF 1 (95-page initial complaint with sections detailing STB proceedings); ECF 27 (91-page "proposed findings of fact" including restatement of STB proceedings); ECF 64 (35-page brief including recitations of STB history, role, jurisdiction, and actions); ECF 107-1 (32-page brief with restatement on status of STB proceedings); *id.* at 29 (explaining counsel's engagement in STB proceeding); ECF 114 at 4–5 (explaining counsel's work in petitioning the STB to compel abandonment).

> From the November 18, 2016 STB Decision onward, every lawyer
> in this case knew that the methodology whereby *temporary takings*
> damages would be quantified and awarded to the Arnold Plaintiffs
> was to determine the rental value of *the property "taken" during the*
> *one-year duration of the "taking."* The Government, however, continued
> to press every defense to these modest claims, thus requiring Plaintiffs
> to engage in continuous litigation from 2015 through 2020.

ECF 209-2 ¶ 93 (emphases added).  Counsel further represent:

> Controlling authority, which requires no citation at this point, makes
> it very clear that the issuance of the NITU, standing alone, constitutes
> a taking of property which, should the NITU expire, will be deemed
> to be *a temporary taking equal in duration to the time the NITU*
> *was in effect. . . . The Government knew or should have known* as of
> 10/13/2016, that since the NITU would not be extended by the STB in
> the face of NCKR's [sic] objection, this case would be and forever
> remain a case of temporary taking. . . .

ECF 222 at 11–12 (emphases added).

Briefing throughout this case, however, undermines counsel's current
reflections.  Early on, counsel contended that the taking at issue was "temporary
in nature" and ended on "the expiration of the NITU extension . . . on October 16,
2016."  *See* ECF 33 at 19.  Less than seven months later, counsel submitted a
35-page brief arguing that "the duration of the taking is measured from the NITU
to the March 1, 2018 deadline," and that "[t]he United States is currently liable
for a temporary taking from October 21, 2015, until March 1, 2018."  *See* ECF 64
at 32–33.  Counsel further proffered "the taking [could be] permanent in nature."
*Id.* at 33.  In their July 2019 brief on state law abandonment, counsel stressed:
"The *Arnold* Plaintiffs maintain that the extensions of the consummation of
abandonment deadlines, each requiring STB 'decisions' and each decision thereby
extending STB jurisdiction, resulted in similarly extending the duration of the
taking."  ECF 107-1 at 20 n.6.  Then, in early 2020, five months after the NKCR
abandonment, counsel again changed their position, arguing that "the duration
of the federal law-based taking ceased at the time of NKCR's September 3, 2019
abandonment consummation."  *See* ECF 119 at 6.

Defendant, in contrast, maintained that the October 16, 2016 expiration of
the NITU put a clear end to the claimed taking.  *See, e.g.*, ECF 42 at 143 (June 7,
2017 brief stating "this action concerns a NITU that was in effect for less than a
year . . . alleged *temporary* taking") (emphasis in original); ECF 65 (October 2, 2017
brief stating "the relevant time period for determining whether the United States is
liable for a temporary taking in this case begins with the issuance of the NITU on

October 22, 2015, and ends with the expiration of that NITU on October 16, 2016"); ECF 115 at 2 (October 16, 2019 brief reiterating "the period for any temporary taking is the period that the NITU was in place, *i.e.*, from October 22, 2015 to October 16, 2016").

As late as February 26, 2020–five years into this case and when the parties jointly requested a stay pending the Federal Circuit's decision in *Caquelin II*– plaintiffs' counsel argued, after taking several inconsistent positions, that the taking lasted until at least September 3, 2019, and would end only "when the owners regained their state law right to use the land." *See* ECF 122 at 4. On this record, counsel's assertions that the government prolonged the resolution of this critical issue rings hollow.

Next, plaintiffs stress the long history of this case supports the requested 2,163.1 attorney hours claimed. In support, plaintiffs refer to the timekeeping records maintained by the United States Department of Justice in the *Dawson* case to suggest the tendered hours in this case are on par and, thus, reasonable. In citing the seven-year pendency of the case, plaintiffs seemingly ignore the following: proceedings were idle or stayed for extended periods while the parties reached impasses and engaged in settlement negotiations[37]; since December 2020, the sole issue remaining has been plaintiff's URA application, which the parties endeavored to resolve without judicial intervention; the requests for extensions of time filed by both parties; and, as highlighted above, plaintiffs' litigiousness and evolving legal positions. The last item on this non-exhaustive list explains the alleged parity between the hours billed by plaintiffs' counsel and the time attributed to this case by defendant's counsel: the government, as *the defendant*, must respond to each argument and filing made by plaintiffs regardless of length or merit.[38] For example, as explained above, plaintiffs' decision to ignore the Court's directive to limit briefing on title issues and, instead, brief comprehensive liability issues necessitated two rounds of briefing comprising thousands of pages.

Counsel's current reliance upon state law abandonment is similarly telling. In seeking reimbursement for the hours billed on state law abandonment, plaintiffs note the filing was ordered by the Court. *See* ECF 222 at 14 ("by filing a brief on the 'abandonment' issue, the Arnold Plaintiffs did no more than to respond to an order directing them to do so . . ."). However, plaintiffs fail to acknowledge that

---

[37] *See, e.g.*, ECF 99–ECF 100 (no docket entries between October 10, 2018, and June 5, 2019); ECF 136 (four consolidated cases stayed effective September 21, 2020, at the parties' request, to permit settlement discussions).

[38] Additionally, as noted by the Court in denying the *Dawson* plaintiffs' motion for reconsideration, the government's time sheets are not comparable to private counsel's billing records: they are not created, maintained, or used for the purpose of justifying or seeking payment from clients or, as here, under a fee-shifting statute.

they urged the Court to order the parties to brief this issue over the government's objection. *See, e.g.*, ECF 105 (plaintiffs propose briefing on state law abandonment "[d]espite the United States' objection that this briefing on state law abandonment is not necessary at this time."); ECF 107-1 at 30 ("The Plaintiffs submit that Kansas state law abandonment has occurred to the Lines, thereby triggering the plaintiff landowners' reversionary property interests."); ECF 115 (defendant stating "the issue of 'state law abandonment' is irrelevant"). Indeed, it was only *after* NKCR consummated abandonment on September 3, 2019, that plaintiffs stated in their September 5, 2019 brief: "state law abandonment is irrelevant and not necessary." *See* ECF 109 at 2.

In the end, this one-year temporary taking dispute was resolved through one round of cross-motions for partial summary judgment (addressing a few outstanding title issues) and a negotiated settlement of liability and just compensation. This case did not involve novel legal issues or complex discovery. Further, there were no expert witnesses, depositions, in-person court proceedings (proceedings were limited to telephonic status conferences), evidentiary hearings, trials, or interim appeals.

Save the URA application filed in the consolidated *Dawson* case, the Court finds no comparable precedent with a similar ratio of damages achieved to attorney's fees requested, particularly in a case where most issues were resolved through settlement–protracted in large measure due to plaintiffs' litigation approach and demands for excessive attorney's fees. On this record, to account for the minimal degree of success and the foregoing considerations, the Court finds an additional adjustment to the overall hours claimed is warranted. If ever there is a case falling into the "rare and exceptional" category meriting a downward adjustment to the lodestar figure, this matter qualifies. However, given the specific reductions already imposed, and mindful of potential "double counting" concerns, the Court imposes an additional 35% hours-only adjustment, without reducing the hourly rates awarded or the calculated lodestar figure. *See Blum*, 465 U.S. at 899–900 (adjustment to lodestar figure constituted double counting based on the same factors used to assess reasonable hours and rates).

### Compensable Attorney's Fees

As captured in the table below, with the foregoing adjustments to rates and hours, the Court awards attorney's fees in the amount of $111,215.87 as follows:

| Attorney | Requested Rate | Adjusted Rate | Requested Hours | Adjusted Hours | Adjusted Fees |
|---|---|---|---|---|---|
| R. Deryl Edwards | $450/hour | $315/hour | 2,015.8 | 322.6827013 | $101,645.05 |
| James F.B. Daniels | $425/hour | $265/hour | 147.3 | 36.1163075 | $9,570.82 |
| | | | | **Total** | **$111,215.87** |

## IV.   Claimed Expenses

Under the URA, successful plaintiffs may seek the reimbursement of reasonable expenses incurred in the course of the litigation.  *Bratcher*, 136 Fed. Cl. at 801.  To recover litigation expenses, however, plaintiffs must demonstrate the costs incurred were "reasonable and necessary" in furtherance of the case and produce adequate proof to facilitate the Court's review.  *Id.* (quoting *Oliveira v. United States*, 827 F.2d 735, 744 (Fed. Cir. 1987)).  In this case, plaintiffs seek reimbursement of $75,584.17 in claimed litigation expenses.  Urging substantial reductions, defendant contends counsel failed to substantiate all but $463.35 in court filing fees, and plaintiffs improperly seek unnecessary and non-reimbursable overhead costs as well as expenses attributed to unsuccessful claims.  The Court agrees significant reductions are warranted.

### A.   Elite Service Fees

As part of their requested litigation expenses, plaintiffs seek reimbursement in the amount of $69,840.00 purportedly paid to Elite for services rendered in this case; specifically, 465.6 hours at $150 an hour for "real estate title and abstracting services."  *See* ECF 208 at 43; ECF 218.  The record presented does not include information pertaining to the names, positions or titles, or qualifications of the contractors who performed the claimed services, and does not otherwise justify the hourly rate requested.  The record is similarly devoid of any substantive information about Elite.  Online research using the limited information available merely revealed a single-family residence in Neosho, Missouri.

Review of the billing entries suggests Elite was contracted to perform paralegal and secretarial support for Mr. Edwards: approximately 70 entries are captioned "Conduct assigned research and investigation of legal and factual issues for inclusion in the forthcoming compliant"; and another 130 entries are captioned "Performing work assignments on case."  *See generally* ECF 218 at 2–21.  The tasks Elite billed for include, for example: retrieving and researching land ownership and conveyance records; drafting, reviewing, and forwarding unspecified documents and correspondences; communicating with Mr. Edwards; obtaining and reviewing case-related documents; and assisting with court filings and miscellaneous administrative tasks.[39]

---

[39] *See generally* ECF 218-1 at 1–21 (various task entries for "t/c" or otherwise corresponding with the "office," namely, Mr. Edwards' "draft" or "review" of unspecified emails); *see, e.g.*, *id.* at 3 ("Continue printing maps from the Assessors GIS records of current landowners . . ."; "Copy scan and print maps of landowners for mailing"); *id.* at 8 ("Scan Decatur source deeds and prepare for meeting"; "Meeting with Office to inform them re source deeds . . ."); *id.* at 13 ("T/c office Morlock Fee agreement, one of the last clients to sign"), *id.* at 15 ("Meeting with office re claims"), 16 ("T/c with Office re client contacts"); *id.* at 17 ("Email copy of email from DOJ sent from Office"; "download[,] print[,] forward to office"; "Email to office with attachments of 10 exhibits for filing"; "Email to Office

Of the 465.6 hours attributed to Elite, over 315 hours (approximately 70%) were billed *before* the STB issued the NITU and *before* counsel filed the initial complaint.  To the extent decipherable, the claimed work is largely attributable to counsel's business and client development efforts, or secretarial assistance.  The fact that counsel outsourced this work does not change the non-compensable nature of the expended hours.  Similar to counsel's billing records, most of Elite's billing entries fail to identify a landowner or prevailing plaintiff, exhibiting little effort to distinguish between compensable hours expended on ultimately successful claims, potential claims investigated but not pursued, and claims voluntarily dismissed or rejected by the Court.

Elite's attribution of certain hours to specified assignments are suspect, raising additional doubts about the requested recovery.  *After* plaintiffs filed the amended complaint in this case on March 18, 2016, Elite's initial billing records included ten entries–the last entered on November 2, 2020–citing the following work: "Conduct assigned research and investigation of legal and factual issues for inclusion *in the forthcoming compliant* [sic] . . . ."  ECF 209-1 at 88–94 (emphasis added).[40]  Without explanation, Elite's revised billing records delete the phrase "for inclusion in the forthcoming compl[ai]nt" from six entries post-dating the filing of the amended complaint.  *Compare* 209-1 at 90, 92, 94 *with* ECF 218-1 at 17, 18, 20–21.  The underlying details indicate work related to pre-complaint investigation related to other claims or another case.

Based on this record, the Court finds plaintiffs' reimbursement request for Elite's purported services largely outside the bounds of reasonably incurred expenses under the URA.  To compensate for the lack of billing judgment, non-compensable business development and administrative work, vague entries, incorrectly assigned ECF numbers, and the unexplained alteration of the original billing records, the Court reduces plaintiff's reimbursement request by 85%– awarding a total of $10,476.00 in reimbursement for Elite's claimed services.

---

re TOC and Cover page"); *id.* at 17 ("Email to Dana Hess re Gebhard maps [] Email with map (wrong map) [] T/c to Dana wrong map check number [] Resend Email with correct map [] Download, print and forward on to Office []"); *id.* at 17 ("Email requesting address for billing"; "Return email with billing info"; "T/c from Office re maps for exhibits and other instructions"; "Email 7 maps to Office due to size"); *id.* at 19 ("Review Email from Office re the 9 Exhibits I don't have"; "Email from Office Re Finding of Facts and Final Cover"; "Review Email from Office Re SJ filing of DOJ"; "forward [bill] to Office for payment"); *id.* at 20 ("Review [E]mail[s] from office").

[40] The billing records include other "complaint"-related exemplary entries post-dating the amended complaint, captioned: "Performing work assignments on case."  *See, generally* ECF 218-1 at 12–15 (after hundreds of hours billed for researching property records and assisting in filing the extensive complaint, Elite billed significant hours reviewing, researching, or pulling the as-filed exhibits); *see also id.* at 17 (July 10, 2017 entry "Email from Office Re Arnold am. complaint"); *id.* at 19 (Aug. 19, 2017 entry for "Email from Office Re Filed Complaint copy").

### B.    Other Expenses

Plaintiffs additionally seek reimbursement of $5,744.17 for other expenses, including: $5,623.37 claimed by Mr. Edwards for travel, lodging, food, court fees, and copying; and $120.80 charged by Elite for printing and copying.  Save court fees, the government objects, citing plaintiffs' failure to substantiate the alleged expenses as well as demonstrate their reasonableness and necessity.  In response, plaintiffs do not offer additional supporting documentation or dispute the government's calculations.

### 1.    Travel & Miscellaneous Expenses

Of the $5,160.02 in litigation expenses claimed by plaintiffs (excluding the $463.35 in court fees), $3,874.26 were reportedly incurred prior to the filing of the original complaint, and $4,275.33 were incurred before the amended complaint was filed in March 2016.  These expenses include travel, lodging, and food purportedly incurred during counsel's trips to counties near the subject railroad, as well as printing, copying, and postage.  As noted *supra*, this case did not require any travel for in-person proceedings or depositions.  Indeed, counsel's claimed travel expenses are largely attributed to counsel's effort to generate business, recruit clients, and vet potential claims.  As such, they do not qualify as reimbursable expenses under the URA.

Moreover, the claimed expenses are not attributed to any plaintiffs, let alone prevailing landowners.  Although roughly 15 entries are designated as "complaint research" or "investigation," the descriptions include meals, hotel expenses, mileage, printing, and postage or shipping.  *See* ECF 209-1 at 4–8.  Put simply, plaintiffs failed to meet their burden of demonstrating the reasonableness of the requested reimbursement.  On this record, the Court finds the pre-amended complaint expenses non-compensable, excluding the undisputed court filing fees in the amount of $463.35.

After filing the amended complaint, Mr. Edwards reportedly incurred $884.69 in expenses, including $519.19 in printing and two invoices totaling $365.50 described as "Litigation Support Vendors."  *See* ECF 209-1 at 26, 34.  The two vendor entries appear to include certain research relating to the claims book and/or plaintiffs' partial summary judgment motion.  The invoices do not detail the nature and scope of the underlying services performed, leaving the Court to speculate whether and to what extent these charges are attributable to compensable work.  On this record, the Court, in its discretion, awards 20% of the purported research charges, in the amount of $73.10.

2.    *Elite Copying Charges*

Counsel also seeks a total of $120.80 billed by Elite for printing and copying. Excluding an unaccounted for $11.00 entered on September 7, 2015, the remaining copying entries accompany the hourly billing, listed in the format of "[XX] Copies @ $0.1" or "[XX] Color Copies @ $0.25." *See generally* ECF 218-1. Presumably, the copying was to facilitate Elite's rendering of its services to Mr. Edwards. The fact that counsel present these copying charges as outside contractor bills does not change the nature of these expenses as non-compensable administrative overhead. Regardless of counsel's contractual arrangement with Elite, the Court finds these charges are not recoverable.

### Reimbursable Litigation Expenses

As captured in the table below, with the foregoing adjustments, the Court awards claimed litigation expenses in the amount of $11,012.45 as follows:

| Requested Expenses | Requested Amount | Adjusted Award |
|---|---|---|
| Elite Service Fees | $69,840.00 | $10,476.00 |
| Mr. Edwards Expenses | $5,623.37 | $536.45 |
| Elite Copying Charges | $120.80 | $0 |
| **Total** | | **$11,012.45** |

## V.    Disclosure of Settlement Communication

One final matter merits attention. In support of plaintiffs' URA application, counsel appended over 100 pages of settlement-related correspondence clearly marked "Confidential Settlement Communication Subject to FRE 408" dated August 6, 2021. *See* ECF 209-4 at 4–112 (settlement letter from the government and accompanying entry-by-entry objections to plaintiffs' billing records under negotiation). Plaintiffs' URA application references and, at times, quotes defendant's settlement positions and includes a specific monetary settlement offer by defendant's counsel made during the then-ongoing negotiations. *See* ECF 208 at 22. Of note, the quoted August 6, 2021 letter specifies that the proposed settlement amount had not been authorized by the United States Attorney General or their duly authorized designee or the client agency. *See* ECF 209-4 at 5. Defendant requests that this correspondence, and plaintiffs' "summaries" of the same in the fee application, be stricken from the record. *See* ECF 217 at 16.

Federal Rule of Evidence 408 generally proscribes the use of evidence of an offer of compromise as an admission of the validity of a claim. Fed. R. Evid. 408. Plaintiffs' submission and citation to unauthorized and preliminary confidential communications are intended to substantiate claimed statutory attorney's fees and

litigation expenses.  Such use runs afoul of this evidentiary rule.[41]  Additionally, in a September 27, 2021 order directing the parties to provide an update on the status of their negotiations, the Court stressed: "the parties shall not provide to the court any dollar figures in the joint status report."  *See* ECF 156.

For these reasons, the Court strikes Exhibit 4 to plaintiffs' URA application (ECF 209-4) as well as plaintiffs' improper references to the confidential settlement communications (ECF 208 at 21–22).

## CONCLUSION

For the foregoing reasons, plaintiffs' motion for attorney's fees and expenses is **GRANTED–IN–PART** and **DENIED–IN–PART** (ECF No 207).  Specifically, plaintiffs are awarded attorney's fees in the aggregate amount of $111,215.87, and litigation expenses in the amount of $11,012.45.  The Court further **STRIKES** Exhibit 4 to plaintiffs' URA application (ECF 209-4) as well as plaintiffs' improper references to the confidential settlement communications (ECF 208 at 21–22).  The Clerk of the Court is **DIRECTED** to **STRIKE** Exhibit 4 to plaintiffs' URA application (ECF 209-4) as well as plaintiffs' improper references to the confidential settlement communications (ECF 208 at 21–22).  The Clerk of the Court is **DIRECTED** to enter **JUDGMENT** accordingly.

It is so **ORDERED**.

Armando O. Bonilla
Judge

---

[41] On this point, plaintiffs' reliance on *Biery v. United States*, No. 07-675, 2012 WL 4497656 (Fed. Cl. Sept. 27, 2012), is misplaced.  *Biery* did not involve, and the Court did not address, the unilateral public filing of confidential settlement communications let alone the disclosure of unauthorized (and unapproved) specific monetary terms offered in the course of preliminary settlement negotiations.